STATE OF CONNECTICUT *v.* PETER CARBONE
STATE OF CONNECTICUT *v.* JAMES CARBONE

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and MACDONALD, Js.

Argued October 19, 1976—decision released January 18, 1977

*Ira B. Grudberg,* with whom was *Mari-Jo Scopac,* for the appellant (defendant Peter Carbone).

*Raymond W. Beckwith,* for the appellant (defendant James Carbone).

*Joseph T. Gormley, Jr.,* chief state's attorney, with whom was *Robert E. Beach, Jr.,* assistant state's attorney, for the appellee (state).

LOISELLE, J.   Prior appeals in these cases were argued in this court during the November term of 1974 and decided in March, 1975.[1]   The opinion does

---

[1] 36 Conn. L.J., No. 37, p. 5.

not appear in the Connecticut Reports. So that our recital of various facts from the finding shall not be interpreted as being, in any respect, different from those facts considered in the prior decision, the entire discussion relative to the finding of facts in the prior decision is included in a footnote.[2]

Many of the details recited in that opinion will not be repeated here. Briefly, the defendants, James Carbone and Peter Carbone, were convicted after

---

[2] The finding with respect to the motions discloses the following facts: In July of 1971, Detective Robert J. Cafferty of the Bridgeport police department became involved in an investigation of thefts of precious metals from the Carpenter Technology Corporation, hereinafter Carpenter, in Bridgeport. On September 2, 1971, Cafferty and Robert J. Magee, an employee of Carpenter, applied for and obtained a search and seizure warrant for the premises of Fairfield Scrap. The warrant commanded a search for a variety of named precious metals, and other items employed in the theft of those metals. Prior to making application for the warrant, Cafferty had been informed by Albert Edwards and Russell Scofield, the men admittedly directly responsible for the thefts, that the name "John Parks" had been used on one of the receipt slips signed at Fairfield Scrap where they claimed to have delivered the stolen items. Through an oversight, Cafferty failed to seek the inclusion of the "John Parks" receipt or, indeed, of any slips or receipts involving Scofield, Edwards or "John Parks" in the list of items authorized to be seized.

The warrant was executed on September 2, 1971. With Cafferty and Magee at the time of the execution of the warrant were . . . Popowski, an employee of Carpenter, who was present in order to identify items that might be found belonging to Carpenter, and Alfred Constantino, a special investigator for Federal Insurance Company of New York, who was aiding and assisting Detective Cafferty in the investigation and was present during the search in connection with Carpenter's claim with regard to the loss of the metal. Patrolman John Sleeper, a photo technician of the Bridgeport police department, Detective Stephen Zadrovitz and Sergeant Edward Targowski of the Fairfield police department, and Special Agent Edward Buffum of the F.B.I. also assisted Cafferty in the search. None of the law enforcement officers was in uniform.

Magee, Popowski, Constantino and Patrolman Sleeper accompanied Detective Cafferty, in his police car, to Fairfield Scrap, and there was a general conversation en route about whether they might find anything with Edwards' name or Scofield's name on the Fairfield

a jury trial of four counts of larceny of personal property in excess of $2000 on four different dates between January 8, 1971, and February 20, 1971. James Carbone was the owner of Fairfield Scrap Metal Company, hereinafter referred to as Fairfield Scrap, in Fairfield, and Peter, his son, was an employee. Russell Scofield and Albert Edwards, two former employees of Carpenter Technology Corporation, hereinafter referred to as Carpenter, in Bridgeport, testified that they had stolen copper

Scrap premises. Cafferty told the others not to search for anything, but that if they happened to see anything with those names on it, to let him know. He also mentioned that there might be paper work or slips. There also was a discussion concerning "John Parks," or slips possibly bearing that name. Cafferty instructed the others that they were not allowed to search for slips with the name "John Parks" because such items were not named in the warrant. He told them that if they ran into the names Scofield, Edwards or "John Parks" it could be meaningful, and he admonished them to "keep their eyes open" for those names and to tell him if they saw those names at all. Popowski understood Cafferty's advice to mean that if he saw the names Scofield, Edwards or "John Parks" on a piece of paper, he should say something, but that it was not intended that he actually go and look for them. No indication was given to Popowski that the name "John Parks" might be found on a receipt of Fairfield Scrap.

Fairfield Scrap is a sole proprietorship owned by James Carbone, and Peter and Frank Carbone are the sons of James and employees of Fairfield Scrap. The Carbones are hereinafter individually referred to as James, Peter and Frank and collectively as the Carbones. Upon arrival at Fairfield Scrap, Sergeant Targowski sought out Peter and informed him that they were present with a search warrant, and read to him from the warrant the items for which they were searching. Peter threw up his hands and said: "Go ahead and look." He and Targowski then accompanied Cafferty inside the main building where Cafferty began looking through closets for items named in the warrant. James arrived a few minutes later. Targowski had the warrant in his hand at this time and showed it to James but he could not be sure if he read any portions of it to James. James asked Targowski some questions, but Targowski referred him to Cafferty, since Cafferty was familiar with the warrant. James never took the warrant and read it. Targowski then returned the warrant to Cafferty, who went upstairs to the rear office and gave Peter and James the *Miranda* [384 U.S. 436, 86

and nickel from their employer on various dates, transported it in rented trucks, and sold it to the defendants at Fairfield Scrap. Scofield stated he had signed a slip under the name of "John Parks." A slip bearing that signature was admitted into evidence. There was also evidence that Fairfield Scrap had sold copper and nickel to a New York scrap dealer on two occasions near the dates of thefts from Carpenter.

S. Ct. 1602, 16 L. Ed. 2d 694] warnings. Cafferty advised Peter that he was present legally for a search and seizure, and Peter did not at that time ask Cafferty to read the warrant in its entirety.

Along with the police officers, the civilians who had arrived with them went around the premises assisting the officers, since they were familiar with the items being sought. The men searched the premises and the building. At various times during the search, Cafferty was accompanied by the civilians, Popowski and Magee, Patrolman Sleeper, Sergeant Targowski and Detective Zadrovitz. Nothing was found on the premises that was listed in the warrant.

At some time after Cafferty arrived, Constantino asked him whether he could look at the sales receipts, paper slips or sales slips of Fairfield Scrap. Cafferty told Constantino that he could do so only if he obtained the voluntary permission of the Carbones. In Cafferty's presence, Constantino asked Frank if he could look at the sales receipts and slips. Cafferty said nothing, although he knew that a possible result of Constantino's question would be that Constantino would look through the slips and that if he found anything with the names Scofield, Edwards or "John Parks" on it, he would show it to Cafferty. In reply to Constantino's request, Frank asked James, and James replied: "Well, I see no reason why he shouldn't see them. Fine, let him have them." Frank indicated to Constantino that he could see the business slips, and James then asked Frank: "Where do we keep them?" Frank produced the slips and Cafferty then left the area. Popowski and Constantino looked through the records although neither man had asked the Carbones whether Popowski could inspect these items. Neither man had informed the Carbones who he was or why he was present. Neither man had sought the permission of the Carbones to be on the premises. Constantino considered himself validly there under the terms of the warrant and at the invitation of the police. In viewing the slips, Constantino and Popowski were looking for the names Scofield, Edwards and "John Parks."

Popowski came across a slip signed by "John Parks" and then went outside and told one of the police officers. Cafferty was advised

Before the trial, motions to suppress the slip were denied.[3] The slip had been seized while a search was being conducted on the premises of Fairfield Scrap by the police, acting under a warrant. It was not one of the items listed on the warrant. Alfred Constantino, an insurance investigator who accompanied the police, had inquired of Detective Robert J. Cafferty, who was in charge of the search party, whether he could search for sales slips. Constantino was told that he could not search under the warrant as the sales slips were not listed but

of the discovery and returned to the scale room. When he arrived back no police officers were present. Cafferty asked Frank in James' presence if he could have the slip or a copy of it. Frank agreed, but said that he would have to have a copy of it for the business. Cafferty took the original and one photostatic copy and left a photostatic copy with the Carbones. The slip was discovered approximately an hour or an hour-and-a-half after the search was begun. After the slip was discovered, Constantino did not ask the Carbones whether he could show the slip to the police. The Carbones were not asked to sign a consent to search form nor were they advised that the seizure of the slip was beyond the scope of the warrant. Cafferty never discussed the presence of the civilians with the Carbones nor did he seek their permission to have Constantino on the premises. Targowski saw Constantino and Popowski going through the slips and did not ask what they were doing, although he was aware that there was no authority under the warrant to search for or through said items.

Constantino was a New York detective for eighteen years prior to joining Federal Insurance Company of New York. Cafferty had arranged to invite Constantino so that he could aid and assist the police, if he observed or noted anything, and as another person to look around, although Constantino had no police powers. Popowski was asked by Constantino to help him look through some records. He handed Popowski a pile of slips and asked him to look through them for the names Scofield, Edwards or "John Parks." Peter was not in the room when the slip was discovered, but accompanied Targowski to make the photostatic copies upstairs.

[3] Certain corrections in the finding of the court which decided the motions to suppress were made in the statement of facts in the opinion on the former appeal of this case. The other corrections sought are immaterial or involve requests to add facts which are merely cumulative.

was told that he could if he obtained consent. He thereafter asked Frank Carbone, another son of James and also an employee of Fairfield Scrap, whether he might look at sales slips. Frank relayed the request to James who replied, "Well, I see no reason why he shouldn't see them. Fine, let him have them." Frank got the slips and brought them out and placed them on a desk in the presence of James. Peter Popowski, an employee of Carpenter who also accompanied the police on this visit, joined Constantino in looking through the slips and discovered the "John Parks" slip. Frank, in the presence of James, was asked if the slip or a copy of it could be taken. Frank agreed and two photostatic copies were made. A receipt signed by Frank and James was made out.

The court ruled that the search was conducted by private citizens, and the fourth amendment thus was not applicable. This court disagreed, concluding that Popowski and Constantino were assisting the police and "thus, must come within the countenance of the fourth amendment." The lower court also concluded that James Carbone gave his voluntary consent to the search, that Peter lacked standing to object, and that consequently it did not need to consider the objections relating to the validity of the warrant. This court determined that Peter had standing, and that the lower court erred in failing to consider all the circumstances surrounding the purported consent, including any question of the validity of the warrant under which entry to the premises was gained. The judgments were set aside and the cases remanded for further proceedings.

On remand, the court found that the warrant was valid, the consent was voluntary, and that the con-

sent of any of the Carbones, all of whom had a right to be on the premises, was effective as to the others. The judgments were reinstated, and the defendants have again appealed.

The defendants claim that the warrant was invalid because there was no probable cause to believe that the items listed therein would be found, on that date, at Fairfield Scrap. The affidavit attached to the warrant, which was issued on September 2, 1971, stated that Scofield and Edwards, who had been apprehended in July of 1971, had delivered metals and apparatus for moving metals (the items listed on the warrant) to Fairfield Scrap in January and February of that year. Noting the time lapse, this court stated in its prior opinion that "there was merit to the claim the warrant was stale."

Upon remand, the motions to suppress to which this court had addressed itself were resubmitted to *Irving Levine, J.*, who had ruled on the motions previously. It was agreed by all parties that a new record need not be made and that the facts presented in the first hearing on the motions to suppress could provide a sufficient evidentiary basis for the new conclusions. Consequently, the finding of facts included in the record is controlling.

The motions to suppress and for the return of the slip were denied by the court. As there was no supplemental record made, we look to the memorandum of decision to determine the reasoning for the conclusion reached by the court. *In re Application of Dodd,* 132 Conn. 237, 240, 43 A.2d 224. In considering the list of items enumerated in the

warrant,[4] in view of the previous opinion of this court that as a matter of law the search was not a private search, that Peter Carbone had standing to challenge the search, and that the claim of staleness of the warrant had merit, the court determined that the apparatus for handling metal (two chains and a tarpaulin) would have been useful in the defendants' business and was not ordinarily bought and sold in that business. The court concluded that the apparatus probably would have remained on the premises and the warrant was therefore not stale.

The court recognized that there must be probable cause that the items sought are on the premises when the warrant is issued. This principle was enunciated by the United States Supreme Court in a statutory, rather than a constitutional, context in *Sgro* v. *United States,* 287 U.S. 206, 210, 53 S. Ct. 138, 77 L. Ed. 260. The requirement, however, is believed to be one of constitutional proportions. See *Bastida* v. *Henderson,* 487 F.2d 860 (5th Cir.); *United States* v. *Guinn,* 454 F.2d 29 (5th Cir.); *State* v. *DeNegris,* 153 Conn. 5, 9, 212 A.2d 894. It is also recognized that a time lapse between the observations on which the affidavit is based and the issuance of the warrant is an important consideration, but not necessarily controlling under all circumstances. *United States* v. *Steeves,* 525

---

[4] The items to be searched for included in the warrant were: "a. Precious nickel cathoes in pallet form stamped with the initials INCO. b. Copper inserts, square with rounded corner, ranging in weight from 2,500 to 4,000 lbs. c. Braided cable chain with bull ring and L hooks for lifting inserts. d. Heavy link chain wth oval bull ring. e. Gray Tarpaulin canvas, approximately 6' x 12', rope pulls at both ends. f. Hanna Nickel described as small ingot form rectangular in shape, approximately four to five inches thick, five to six inches wide, thirty inches long, with weight of approximately fifty pounds each."

F.2d 33, 38 (8th Cir.). We previously did not find that the time lapse alone was so great as to invalidate the warrant as a matter of law. The motions to suppress were remanded to be considered in the light of our opinion and the case was not remanded for a new trial absent the items seized under the warrant. If items of property are innocuous in themselves or not particularly incriminating and are likely to remain on the premises, that fact is an important factor to be considered in determining the staleness of a warrant. In *United States* v. *Steeves,* supra, it was held that a warrant issued to search for items used in a robbery three months earlier was stale as to the money and the bank's money bag, but not as to a gun, a ski mask, and clothing worn by the robber. "The ski mask and the clothes were not incriminating in themselves, and apart from his prior felony record possession of the pistol was not unlawful in itself or particularly incriminating. Moreover, people who own pistols generally keep them at home or on their persons." Id., p. 38; see also *United States* v. *Rahn,* 511 F.2d 290 (10th Cir.) (warrant to search for guns issued on information eighteen months old not stale when affidavit showed the defendant had said guns would appreciate in value if kept, had been seen making personal use of one gun, and search of records of area pawnshops revealed no sales by the defendant). On the court's analysis it cannot be held that the court erred in denying the motions to suppress.

Because the warrant is found valid, it can no longer be maintained that the slip was "the indirect product of an unlawful search," and thus excluded according to *Wong Sun* v. *United States,* 371 U.S. 471, 484, 83 S. Ct. 407, 9 L. Ed. 2d 441. And because

there was no "claim of lawful authority" to search for the sales slip, this case is distinguishable from *Bumper* v. *North Carolina*, 391 U.S. 543, 549, 88 S. Ct. 1788, 20 L. Ed. 2d 797, in which a woman "consented" to a general search after a policeman, without showing a warrant, announced, "I have a warrant to search your house." Here the actual warrant was read to Peter and shown to James, and a specific separate request to search for the sales slip was made by one who had been informed that he could not search for the slip without express consent.

In determining whether the consent was voluntary, all the circumstances are to be considered. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854. It is a question of fact for the court. *State* v. *Hanna*, 150 Conn. 457, 471, 191 A.2d 124. The court, having found that Constantino was not on the premises unlawfully, considered the other circumstances surrounding the consent, and as stated in its memorandum of decision: "The conversation between the Carbones and Constantino indicates that permission was sought and voluntarily given. The defendant James . . . by his expression that there was no reason to keep the slips from Constantino, indicated his willingness and again indicated his willingness by asking where they were kept so that their production would be aided. To go further, when Cafferty asked for the slip or photostats of it, [James] indicated his voluntariness through sitting in the presence of Frank, who agreed, and by allowing the defendant Peter to assist in the making of the photostats and by signing the Cafferty receipt. . . . [A]ll the Carbones were adults, who were operating a business, who had been advised of their constitutional rights

by the officers, and who gave their consent within a short period of time after the subject of the slips was first raised."

The determination by the trial court that consent was voluntary was reasonable considering all the evidence together with the reasonable inferences which could be drawn from it. There is no error in the denial on remand of the motions to suppress.

The defendants also claim error in the court's reinstatement of the judgments without a new trial. The Practice Book contains no mention of a motion to reinstate judgment. A new trial would have been needed, however, only had the motions to suppress been granted on remand. Reinstatement of the judgments after the motions were denied was not error. *McIsaac* v. *Hale,* 105 Conn. 249, 250, 135 A. 37, states that a finding of error with a remand to proceed according to law destroys the first judgment and requires a new trial of all the issues. In the present case, however, there were two separate proceedings: the motions to suppress, heard by the court, and the trial by jury. The previous opinion concerned itself entirely with the court's denial of the motions to suppress and the remand to proceed in accordance with the opinion necessarily was limited to the motions to suppress as no other matters were discussed. Where the error occurred only in the first proceeding, and it was cured in a manner which did not change the evidence admissible in the second, a new trial was not required. See *Jackson* v. *Denno,* 378 U.S. 368, 394, 84 S. Ct. 1774, 12 L. Ed. 2d 908.

The defendants were entitled under the remand to a determination of motions to suppress and if

the motions were granted, necessarily to a new trial without the admissions of those items of evidence suppressed. If, as happened in this case, the motions to suppress were denied, the most that the defendants were entitled to under the terms of the remand was this determination and no further action by the court other than rendering judgment. "The reversal of a judgment annuls it, but does not necessarily set aside the foundation on which it rests. This foundation may be sufficient to support a judgment of a different kind, and may be such as to require it. A reversal therefore is never, standing alone, and ex vi termini, the grant of a new trial. If the error was one in drawing a wrong legal conclusion from facts properly found and appearing on the record, it would be an unnecessary prolongation of litigation to enter again on the work of ascertaining them." *Coughlin* v. *McElroy,* 72 Conn. 444, 446, 44 A. 743. See the cases of *Fitch* v. *State,* 138 Conn. 534, 86 A.2d 718, and *Fitch* v. *State,* 139 Conn. 456, 95 A.2d 255, wherein the court rendered judgment on the second case after remand to correct a referee's report with no right in the appellant to have the issues tried again. See also *Lamenza* v. *Shelton,* 96 Conn. 403, 413, 114 A. 96; *Nowsky* v. *Siedlecki,* 83 Conn. 109, 118, 75 A. 135. The defendants claim that as the previous judgment was set aside, they had a right to a new trial with the presentation of evidence as if no prior trial had occurred. As stated in *Coughlin* v. *McElroy,* supra, 447, "[a] case cannot be presented by halves. In every trial which may result in an appeal to this court, it is the duty of each party, so far as he is able, to see that whatever is material to support his contentions is proved and found. If he contents himself with bringing for-

ward only so much as he may deem sufficient to meet those of his adversary, he must be prepared, should an appeal be taken on either side, to have it decided with reference to no other facts than those apparent on the record." In this instance, the only matter remanded, in effect, was the propriety of the admission of an item obtained during a search. As that matter has been resolved in favor of the state, there is no need for a new trial on the issues already tried to completion.

In the court's prior opinion, it is true that it was stated that "our ruling with regard to the motions to suppress obviates the necessity of discussing the issues with regard to the trial." Had the trial court on remand granted the motions to suppress, a new trial would have been required, and claims of error in the first trial would have been mooted. Because a new trial did not occur, this court must now consider the defendants' claims of error at the trial.

The defendants claim that the prosecutions were abated, prior to the bringing of the informations, by the repeal of § 53-63a of the General Statutes, under which they were prosecuted. The repeal took place as part of a revision of the entire criminal code of this state. 1969 Public Acts, No. 828, § 214, effective October 1, 1971. Section 54-194 of the General Statutes, however, provides: "The repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect." The defendants claim that § 54-194 itself was implicitly repealed by the later enactment of § 1-1 (t), which states: "The repeal of an act

shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or
any suit, or prosecution, or proceeding pending at
the time of the repeal, for an offense committed,
or for the recovery of a penalty or forfeiture
incurred under the act repealed."

Section 1-1 (t) is a blanket provision drawn to
cover both criminal and civil statutes. It has been
described as "broader" than § 54-194. *Simborski* v.
*Wheeler*, 121 Conn. 195, 200, 183 A. 688. A mere
overlap between the two statutes does not constitute
an implied repeal of the earlier. Section 1-1 (t) preserves punishments incurred and prosecutions pending, but it does not state that liability to prosecution
shall not be preserved under some other statute.
Since the defendants were liable to prosecution at
the date of the repeal, § 54-194 preserves that liability. "Repeals by implication are not favored and
will never be presumed where the old and new statute may well stand together. *Fair Haven & W.R.
Co.* v. *New Haven*, 75 Conn. 442, 447, 53 A. 960; *Bissell* v. *Dickerson*, 64 Conn. 61, 29 A. 226; *Windham
County Savings Bank* v. *Himes*, 55 Conn. 433,
12 A. 517. . . . Furthermore . . . '[i]f courts can
by any fair interpretation find a reasonable field of
operation for both statutes without destroying or
perverting their evident meaning and intent, it is
the duty of the courts to do so, thus reconciling
them and according to them concurrent effect. *Leete*
v. *Griswold Post*, 114 Conn. 400, 405, 158 A. 919;
*Costa* v. *Reed*, 113 Conn. 377, 385, 155 A. 417, and
cases cited; 1 Sutherland, Statutory Construction
(3d Ed.) § 2014.' *Shanley* v. *Jankura*, 144 Conn. 694,
702, 137 A.2d 536." *Waterbury Teachers Assn.* v.
*Furlong*, 162 Conn. 390, 404, 294 A.2d 546; *Daley*
v. *Liquor Control Commission*, 166 Conn. 97, 101,

347 A.2d 69; 73 Am. Jur. 2d, Statutes, § 393. There was no error in the court's denial of the pleas in abatement.

James Carbone assigns error in the trial court's refusal to find eight paragraphs of the draft finding which he submitted according to former § 629 of the Practice Book.[5] These paragraphs all involve matters which came out on cross-examination of state witnesses by the defense. The defendant's request that the court include them as evidence offered by and claimed to have been proven by the state was not appropriate. "A party to an action may not force into the claims of proof of his adversary factual matters on which the latter does not rely." *Darling* v. *Burrone Bros., Inc.,* 162 Conn. 187, 190, 292 A.2d 912; *Franks* v. *Lockwood,* 146 Conn. 273, 276, 150 A.2d 215. The court properly denied the request.

The informations charged each defendant with four separate counts of larceny in excess of $2000, in violation of then § 53-63(a) of the General Statutes.[6] In his motion for a bill of particulars, James Carbone asked "whether the state claims the defendant is a principal thief or receiver of stolen goods." The state objected to this portion of the motion, and the court denied the defendant's request to force the state to specify. This was error. Under the former statutory scheme, § 53-65 of the General Statutes[7] authorized prosecution and punishment of a receiver as a principal offender under § 53-63. One charged under the larceny statute could be convicted by proof either that he was a principal or that he was a receiver. *State* v. *Palkimas,* 153 Conn. 555, 562, 219

[5] Repealed October 1, 1974.
[6] Repealed October 1, 1971.
[7] Repealed October 1, 1971.

A.2d 220. The essential elements of larceny and of receiving stolen property differ. *State* v. *Huot,* 170 Conn. 463, 467, 365 A.2d 1076. The information cited the larceny statute and alleged specific conduct of the defendant. It did not allege specifically any of the elements of the crime either of receiving stolen property or of larceny, except insofar as those elements might be understood as comprehended in the reference to the statute. Indeed, since it referred only to § 53-63(a), and made no mention of § 53-65, the information would not have apprised a layman of the possibility of a conviction for receiving stolen property.[8] "In all criminal prosecutions, the accused shall have a right . . . to be informed of the nature and cause of the accusation." Conn. Const. Art. I § 8; U.S. Const. Amend. VI. "Short form" informations were permitted by Practice Book § 493[9] and held constitutional because the defendant had the opportunity to obtain the information to which he was constitutionally entitled by requesting a bill of particulars. *State* v. *Davis,* 141 Conn. 319, 321, 106 A.2d 159. Here the defendant made use of that opportunity so there was no waiver of the right such as was found in *State* v. *Coleman,* 167 Conn. 260, 268, 355 A.2d 11. The error, however, does not require a new trial because it is clear beyond a reasonable doubt that it was not prejudicial to the defendant. *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705. Obviously, the experienced counsel for James Carbone was aware that § 53-63(a) was violated either by larceny

[8] This defect is cured in the present larceny statute, § 53a-119, which specifically includes receiving stolen property as a type of larceny.

[9] Repealed October 1, 1976, except that they remain applicable to proceedings in which an arrest was made or a summons was issued prior to that date.

or by receipt of stolen property; otherwise he would not have asked the prosecution to elect between the two theories. He undoubtedly understood the state's refusal to elect as an implicit statement that it was charging both and would endeavor to prove either. See *State* v. *Palkimas*, 153 Conn. 555, 562, 219 A.2d 220; *State* v. *Ward*, 49 Conn. 429, 439. He had notice of this and an opportunity to prepare his case accordingly.

A pretrial motion for severance of the cases was denied by the court. James alleged that he would be prejudiced by the inability of the jury to separate evidence against him from evidence against Peter, and that the evidence against Peter would involve statements inculpating James but not subject to cross-examination by him. It does not appear that James and Peter had antagonistic defenses, or that a joint trial was likely to result in any injustice. Compare *State* v. *Holup*, 166 Conn. 471, 352 A.2d 275. This is not a case analogous to *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476, where a confession by one defendant, properly admissible against him, also implicated another. At the time of the motion counsel did not point to any statements admissible against Peter which might also implicate James, and it is significant, although the likelihood of prejudice must be determined on the facts as known before the trial rather than after, that even now, with the benefit of hindsight, he identifies no such statements in his brief.

The defendant James Carbone also makes certain claims of error in the court's failure to give requested charges. The court charged the jury, both as to the testimony of accomplices and as to good reputation evidence, substantially as requested. The defendant's brief presents no argument to support

these claims of error; therefore, they are not considered. *Nowsky* v. *Siedlecki,* 83 Conn. 109, 119, 75 A. 135; see *Stoner* v. *Stoner,* 163 Conn. 345, 307 A.2d 146. Nor do we consider claims by James Carbone based on exceptions to the charge taken by counsel for Peter Carbone. Practice Book § 249. As already implicitly stated in this opinion, it was not error for the court to charge the jury that the defendant could be convicted either as a principal thief or as a receiver of stolen goods.

The court permitted Scofield to testify, overruling the objection that the testimony of one alleged accomplice could not be used to corroborate the testimony of another. There is no such rule in this state.

The court properly admitted the testimony of a handwriting expert to authenticate the signature on the "John Parks" slip. The defendant cites no authority for the proposition that authentication should not be allowed prior to a claim that the signature is not authentic, nor are we aware of any.

The court admitted the records of Sola Metal, a New York scrap dealer, showing a purchase from Fairfield Scrap of four pieces of copper on January 25, 1971. The pieces weighed 2340, 4240, 2348 and 2420 pounds, with a deduction for 667 pounds of dirt. The indictment charged the defendants with larceny of copper, specifically, five pieces weighing a total of 10,000 pounds, on or about January 24, 1971. The defendant objected that this evidence was speculative and insufficiently tied to other evidence in the case. He pointed to testimony by Edwards and Scofield that there was no way that more than 600 pounds of dirt could have been put on the copper, and to certain other testimony apparently viewed by him as inconsistent, but not presented in the finding

or the brief in such a manner that any inconsistency appears. The dirt is not such an inconsistency as to make the evidence speculative or irrelevant; there was no error in admitting the records.

At the trial, the court refused to permit counsel for Peter Carbone to cross-examine Scofield and Edwards regarding their prior invocation of their fifth amendment privilege when being deposed in a civil action which Carpenter brought against them and the Carbones. It is Peter's contention that this would have shown the bad faith of Scofield and Edwards, who were entitled to claim the privilege, but did so after deciding to cooperate with the police. Peter's theory was that they claimed the privilege only in order to prevent the Carbones from learning their testimony in advance. This amounts to mere speculation. The prior invocation of a constitutional privilege can be motivated by so many factors other than bias that the court was within its discretion in excluding cross-examination on this matter as irrelevant. *Raffel* v. *United States,* 271 U.S. 494, 499, 46 S. Ct. 566, 70 L. Ed. 1054, relied upon by the defendants, is not to the contrary; it held only that when a defendant waived the privilege and testified at his second trial that he did not make a statement reported by a witness, he might be cross-examined concerning his silence at the first trial, which was inconsistent with such a denial. In *Grunewald* v. *United States,* 353 U.S. 391, 77 S. Ct. 963, 1 L. Ed. 2d 931, *Raffel* was distinguished, and the Supreme Court stated that unless constitutional questions are raised by the danger that a jury may equate use of the fifth amendment with guilt, the decision of whether to permit inquiry regarding prior use of that plea to impeach present testimony is one for the discretion of the trial judge, who

should satisfy himself that the prior use of the plea is indeed inconsistent with the present testimony. On the facts in this case, the trial court was within its discretion in barring such cross-examination.

The trial court also excluded certain evidence that Scofield and Edwards rented similar heavy trucks for use on five dates between May 12 and early July, 1971, and that the trucks were used for short mileages, from which an inference might be drawn that deliveries were made only in the Bridgeport area. Edwards admitted that he continued stealing, but maintained he made his deliveries outside Bridgeport after February 20, 1971, the date of the last transaction with which the Carbones were charged. Scofield also claimed that the last sale to the Carbones was February 20, and that later sales were made in South Norwalk. He denied making any deliveries in Bridgeport in June and July. The state objected to the evidence as immaterial, irrelevant, speculative, far removed from the time in question in the case and not inconsistent with other statements of the witnesses. The court has wide discretion as to questions of relevancy and remoteness. *State* v. *Mahmood,* 158 Conn. 536, 540, 265 A.2d 83. Evidence which is inconsequential and tends to distract attention from the real issue should be excluded. *State* v. *Bassett,* 151 Conn. 547, 551, 200 A.2d 473. Since the Carbones were not charged with any crimes after February 20, the truck rental evidence was not related to a matter in issue. It was admissible, if at all, only to impeach the testimony of Scofield and Edwards. Impeaching a witness on a collateral matter by extrinsic evidence is not allowed. *Hirsch* v. *Vegiard,* 137 Conn. 302, 304, 77 A.2d 85; *Johnson* v. *Palomba Co.,* 114 Conn. 108, 115, 157 A. 902.

Peter also claims the court erred in sustaining objections to cross-examination designed to elicit testimony that Carpenter, in connection with its civil suit against Scofield and Edwards, had failed to attach Edwards' house or car or Scofield's real estate. It was the defendant's claim that Carpenter's inaction in this respect showed the witnesses had an interest in helping Carpenter recover its losses from the Carbones. The record reveals that Edwards' house had been placed in his wife's name in 1970, and that his car, purchased in mid-1971, had been repossessed for failure to keep up the payments. Scofield's real estate had been conveyed to his wife in May or June of 1971 in connection with a divorce decree and written agreement. It does not appear that Carpenter could have attached anything except the car, to which the financing lender would have had priority. The court properly sustained the objection.

After duly weighing the claims of the defendants as to the remanded motions to suppress and as to the trial, we find no error in either case.

There is no error.

In this opinion the other judges concurred.