STATE OF CONNECTICUT *v.* JOSE A. MALDONADO
(9155)

SPEZIALE, C. J., PARSKEY, GRILLO, DALY and MENT, Js.

Argued March 7—decision released June 12, 1984

*Jon L. Schoenhorn,* with whom was *Michael R. Sheldon,* for the appellant (defendant).

*Lawrence J. Tytla,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, *Richard E. Maloney,* deputy chief state's attorney, *John M. Massameno,* assistant state's attorney, and *John Nazzaro,* legal intern, for the appellee (state).

PARSKEY, J. The defendant was convicted by a jury of felony murder, in violation of General Statutes §§ 53a-54c and 53a-54a (c) and sentenced by the trial court to a term of not less than twenty years nor more than life. Five of the defendant's six claims on appeal arise out of the disappearance of a state's witness after he had testified for the state but before the defendant had completed cross-examining him. The defendant claims that (1) the failure of this witness to return for the completion of the cross-examination deprived the defendant of his federal and state constitutional rights to confrontation and required the trial court to dismiss the indictment; (2) the trial court's failure to use all available means to seek the return of this witness deprived the defendant of his constitutional rights to confrontation and due process of law; (3) the denial of the defendant's motion to release the grand jurors from their oath of secrecy so that they could testify to inconsistent testimony that the missing witness gave before the grand jury deprived the defendant of his constitutional rights to confrontation and to compel the testimony of witnesses on his behalf; (4) the trial court's failure to permit the introduction of extrinsic evidence to impeach the testimony of the missing witness denied

the defendant his constitutional rights to compulsory process, confrontation and due process; (5) the trial court deprived the defendant of due process by remarking in the presence of the jury that the defendant's testimony about the missing witness' testimony before the grand jury was "self-serving"; and (6) the defendant was denied a fair trial by the state's failure to provide the defendant with exculpatory information in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We find no error.

The jury could reasonably have found the following facts: At approximately 8 p.m. on May 24, 1976, the defendant, who was wearing a red blazer jacket and a blue and white golf hat entered the El Comerieno Cafe in Hartford. He watched television for a while and then inquired of several people whether they had seen Miriam Acosta. He remained inside the bar of the cafe for five or ten minutes and then left. A few minutes later, a man brandishing a pistol entered the cafe, fired a shot, announced a holdup and told everyone to empty their pockets and get on the floor. When this was done, he reached down and picked up some money, fired more shots, one of which hit Ramon Rodriguez, and then departed. Rodriguez died shortly thereafter. On the basis of descriptions given by patrons of the bar of the perpetrator and of a car leaving the scene, the police at 8:30 p.m. stopped a Datsun 240-Z which was orange and had a black stripe. The defendant, who was driving the car, matched the description of the suspect in both dress and appearance. Between the two seats of the car the police found a blue and white hat. Shortly thereafter, the defendant was arrested.

At the defendant's trial, several patrons of the El Comerieno Cafe testified to the events surrounding the murder of Ramon Rodriguez.[1] Victor Resto and Francisco Rivera identified the defendant as the killer.

---

[1] The defendant concedes that he was in the bar prior to the shooting.

Angel Vasquez placed the defendant in the bar during the robbery but did not see the shooting. Dora Ortiz did not see the murderer's face because it was obscured by the gun, but gave a description of his height, weight, build, beard, clothes and hat, which matched the defendant's. Wilfredo Gonzales testified that the defendant had been in the bar prior to the shooting and that the assailant was the same size, wore the same kind of jacket and hat and had similar facial hair as the defendant. Carmen Martinez testified that the defendant was definitely not the man who had shot Rodriguez. The state also introduced evidence that the defendant had purchased a pistol and cartridges of the same type that had killed Rodriguez. The murder weapon was never found.

When on March 30, 1977, after four days of trial, Francisco Rivera was called by the state, he testified that he saw the defendant shoot Ramon Rodriguez. He made an in-court identification of the defendant. At the conclusion of the state's direct examination of Rivera, the defendant began his cross-examination. After briefly exploring Rivera's ability to observe the defendant in the bar, then attempting unsuccessfully to get him to agree that he had given a conflicting account of the incident to the grand jury which had indicted the defendant, counsel sought to introduce the prior felony record of the witness for impeachment purposes. When the arrest record supplied to the defendant by the state was found to contain discrepancies, the state's attorney offered defense counsel the opportunity to examine police records before continuing with his cross-examination. Consequently, court was adjourned until the following morning, March 31, and Rivera was instructed to return to court at that time.

Rivera failed to appear in court the next day. The state proceeded with its case while attempting to locate Rivera. On April 1, two investigators described to the

trial court their unsuccessful efforts to locate Rivera. It was suggested that Rivera had fled because his life had been threatened.[2] The trial court concluded that further efforts would probably be fruitless and thus set a deadline of 10 a.m. on Monday, April 4, by which time the state had to produce Rivera.

On April 4, the two investigators recounted their further unsuccessful investigatory efforts to the trial court. The court concluded that Rivera was unavailable and refused to permit a further continuance. The defendant then moved to dismiss the indictment on the basis of the state's failure to produce Rivera for the completion of the cross-examination.[3] This motion was denied. Thereafter, the state moved to strike Rivera's testimony. Although the trial court considered this the proper remedy, the defendant objected, claiming that that procedure would not erase Rivera's damaging testimony from the jurors' minds. The defendant then stipulated that Rivera's testimony should not be stricken and the jury should not be instructed to disregard it, but reserved all rights on his motion to dismiss. With the agreement of the state, the defendant was then permitted to introduce Rivera's manslaughter conviction into evidence and to have his counsel read to the jury allegedly inconsistent testimony given by Rivera in a pretrial suppression hearing.

---

[2] There was no claim that the defendant had anything to do with the alleged threats on Rivera's life. See footnote 5, infra.

[3] The defendant moved to dismiss the indictment. Since motions to dismiss must be made prior to trial; Practice Book § 815; the defendant's motion was technically improper. The proper motion for seeking the mid-trial termination of proceedings and a new trial is a motion for mistrial. Practice Book § 887. Rather than elevate form over substance, we will treat the defendant's motion as a motion for mistrial. See Lee v. United States, 432 U.S. 23, 31, 97 S. Ct. 2141, 53 L. Ed. 2d 80 (1977). See also Birgel v. Heintz, 163 Conn. 23, 25–26, 301 A.2d 249 (1972).

In the middle of the trial, the defendant moved to dismiss the indictment claiming that the state had failed to disclose exculpatory material. The motion was denied.

## I

We first consider the defendant's claim that the only remedy for the denial of his right of confrontation, caused by Rivera's disappearance, was a mistrial. We do not agree.

Every criminal defendant must be provided with the opportunity fairly and fully to confront and cross-examine adverse witnesses. U.S. Const., amends. VI, XIV; Conn. Const., art. I § 8; *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas,* 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Wilson,* 188 Conn. 715, 721, 453 A.2d 765 (1982); *State* v. *Hackett,* 182 Conn. 511, 517, 438 A.2d 726 (1980). As the defendant concedes, however, not every intrusion on that right requires a mistrial. See, e.g., *State* v. *Reed,* 174 Conn. 287, 299–300, 386 A.2d 243 (1978); *State* v. *Jones,* 167 Conn. 228, 233, 355 A.2d 95 (1974).

When considering a motion for mistrial, the trial court must determine whether some event has occurred which is so prejudicial as to preclude a fair trial. Such a determination is subject to the sound discretion of the trial court. *State* v. *Vass,* 191 Conn. 604, 613, 469 A.2d 767 (1983); *State* v. *Nowakowski,* 188 Conn. 620, 624, 452 A.2d 938 (1982). If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. *State* v. *Altrui,* 188 Conn. 161, 173, 448 A.2d 837 (1982).

In *State* v. *Rado,* 172 Conn. 74, 81, 372 A.2d 159 (1976), we upheld the trial court's denial of a motion

for mistrial when a witness for the state became ill and could not be cross-examined. Because his testimony was "merely corroborative" we found the trial court's decision to strike the testimony and to instruct the jury to disregard it to be the proper remedy. Id., 82–83. Similarly our analysis of this appeal turns on whether the trial court was correct in finding that Rivera's testimony was cumulative and corroborative and hence that any prejudice resulting from the incomplete cross-examination could be remedied by a motion to strike and a curative instruction. Accord *Commonwealth* v. *Davis,* 380 Mass. 1, 401 N.E.2d 811 (1980); *State* v. *Gardner,* 269 S.C. 698, 239 S.E.2d 729 (1977); cf. *State* v. *Malinsky,* 153 F. Sup. 321 (S.D.N.Y. 1957) (where after the trial had just begun the witness suffered a heart attack on the stand and could not be cross-examined, a mistrial was warranted because the state had summarized the witness' testimony in its opening statement and had emphasized its importance, and the jury had witnessed his heart attack and would not forget his presence and hence his testimony on direct examination).

In support of his claim that Rivera was a crucial witness for the state the defendant argues that Rivera was one of only two eyewitnesses to the actual shooting, that as the state's final witness he provided crucial corroboration of the other eyewitness' testimony, and that his in-court identification made an "indelible impression" on the jury. In short, he asserts that, "[w]ithout Rivera, the case would have been a swearing contest between two eyewitnesses, one of whom [Resto] positively identified the defendant as the gunman, while the other [Martinez] claimed with equal certainty that he was not." Further, he claims that it was critical for him to cross-examine Rivera fully on his possible role as a police informant, his attempts to influence others to testify against the defendant, his alleged threats on

the life of defense counsel, his alleged participation in an illegal numbers operation, a prior felony conviction, and possible prior inconsistent statements before the grand jury which had indicted the defendant. For these reasons, he contends that nothing short of a mistrial would have obviated the prejudice he suffered due to Rivera's failure to return for a full cross-examination.

We agree with the trial court that Rivera's testimony was cumulative and corroborative and that his disappearance did not warrant a mistrial. The evidence pointing to the defendant as the gunman was substantial. In addition to Resto's identification of the defendant, the testimony of the other witnesses and the forensic evidence constituted strong circumstantial evidence of the defendant's guilt. Contrary to the defendant's view, without Rivera the case against the defendant was much more than a swearing match between two witnesses. The prejudice that the defendant would have suffered by Rivera's failure to return could have been remedied by the court's striking Rivera's testimony and instructing the jury to disregard it.

Moreover, any prejudice that the defendant may have suffered as a result of his objection to the motion to strike was substantially reduced by the defendant's attempts to impeach Rivera's credibility. By stipulation of the parties the defendant introduced a certified copy of Rivera's manslaughter conviction and read to the jury portions of a cross-examination of Rivera during a pretrial suppression hearing to show prior inconsistent testimony. When he took the stand the defendant testified about alleged inconsistencies between Rivera's grand jury testimony and his testimony at trial. The defendant was free to impeach Rivera's credibility further and to expose his bias against the defendant through cross-examination of other witnesses. The trial court did not abuse its discretion in denying the defendant's motion for mistrial.

## II

The defendant next claims that even if a mistrial was not warranted, because both the prosecutor and the court had not exhausted all methods of securing Rivera's attendance it was premature to declare him unavailable and to offer to strike the testimony. We do not agree.

On April 1, 1977, Inspectors William J. Gaffey and Francis M. Keene of the state's attorney's office testified about their efforts to locate Rivera. On two separate occasions they inquired at places that Rivera was known to frequent, including his home, a grocery store, a bar and his neighborhood. They informed the Hartford police about his disappearance and sought the assistance of a number of detectives who were very familiar with Rivera and other Spanish-speaking police officers. At an in camera hearing,[4] Keene testified that on March 30, 1977, Rivera told him and the state's attorney that his life had been threatened and that he feared for his safety.[5] The court granted a continuance until Monday, April 4, stating "[w]ell, from what I heard, if you don't get him by Monday at ten o'clock, you will never get him."

On Monday, April 4, when Rivera did not appear the two investigators testified to having inquired at the same locations to no avail. Gaffey concluded that a further search would be futile because he believed Rivera was "avoiding the subpoena." Detective Francesco A.

---

[4] The transcript of this proceeding was unsealed for the purposes of this appeal.

[5] Though both the state and the defendant agreed that Rivera feared for his life, they did not agree on the reason for this fear. The state introduced evidence that Rivera had been threatened and shot at by Efrain Gomez in retaliation for his testimony against the defendant but did not suggest that the defendant was involved in these incidents, while the defendant's counsel posited that the threats and attacks were part of a long-standing rivalry between Gomez and Rivera.

Niro of the Hartford police department testified that his search of Rivera's "haunts" on Thursday, March 31 and Friday, April 1 revealed nothing. He stated that the "rumor on the street" was that Rivera had fled and added, "[h]e definitely, prior to this incident, Thursdays he's always at these locations. I've never had any problem locating him in the fifteen, twenty years that I've known him." In response to defense counsel's question, "[d]o you have any ideas as to where he [Rivera] has gone?" Niro responded, "[i]n my years in law enforcement, when men of Spanish extraction are wanted by the police, they flee to Springfield, Meriden, New Britain, Worcester, where a large Spanish colony is situated." When the court indicated it wanted to go forward without Rivera, the defendant requested a continuance so that counsel could attempt to locate the witness. The court denied the motion, stating "[i]t is pretty well established that nobody is going to find him."

The defendant claims that the state's efforts to locate Rivera were insufficient and that the court should have granted the defendant's request for a continuance. He suggests that the state limited its search to checking and rechecking obvious places and that, in light of Niro's statement, it should have expanded its search to New Britain and Meriden, Connecticut, and Springfield and Worcester, Massachusetts. The defendant continues that the state should have sought to compel Rivera's attendance by means of a capias[6] or sought his return from Massachusetts under the Uniform Act

---

[6] Upon proof that a witness has been served with notice to appear, the trial court has authority to issue a capias to compel his or her attendance. See General Statutes §§ 52-143, 54-2a (a) (2); *State* v. *Frye,* 182 Conn. 476, 483, 438 A.2d 735 (1980); *DiPalma* v. *Wiesen,* 163 Conn. 293, 298, 303 A.2d 709 (1972). In this case, the state initially sought a capias, but never provided the court with proof that it had served Rivera with a subpoena. It was the state's position that a capias would not assist it in determining the whereabouts of Rivera.

to Secure the Attendance of Witnesses from without a State in Criminal Proceedings, General Statutes § 54-82i (c).[7]

We do not agree that the state failed in its duty to attempt to locate Rivera. All the testimony pointed to the facts that Rivera was evading the search and that continued efforts to find him would be futile. Other than Niro's general statement about where Spanish-speaking people may flee, there was no evidence indicating that Rivera was in Meriden or New Britain, Connecticut, or Springfield or Worcester, Massachusetts.[8] Moreover, neither a capias nor invocation of the Uniform Act would have ferreted Rivera out of hiding—they would only have been helpful in securing his attendance once he was found.

For these reasons it was also not an abuse of discretion for the court to deny the defendant's request for a continuance. *State* v. *McKnight,* 191 Conn. 564, 576, 469 A.2d 397 (1983). Rivera was clearly unavailable and there was sufficient evidence that despite the state's efforts he would remain unavailable. Moreover, the defendant presented no evidence that he would be able to secure Rivera's attendance. Cf. *Singleton* v.

---

[7] General Statutes § 54-82i (c) provides in relevant part: "If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions . . . is a material witness in a prosecution pending in a court of record in this state . . . a judge of such court may issue a certificate under the seal of the court, stating such facts and specifying the number of days the witness will be required. Such certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this state to assure his attendance in this state. . . . " Accord, Mass. Gen. Laws Ann., c. 233, §§ 12, 13A (1974).

[8] Perhaps the state should have contacted officials in these cities. "One, in hindsight, may always think of other things. Nevertheless, the great improbability that such efforts would have resulted in locating the witness, and would have led to [his] production at trial"; *Ohio* v. *Roberts,* 448 U.S. 56, 75–76, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); justifies the state's decision not to expand its search.

*Lefkowitz,* 583 F.2d 618 (2d Cir. 1978), cert. denied, 440 U.S. 929, 99 S. Ct. 1266, 59 L. Ed. 2d 486 (1979).

### III

We will consider the defendant's next two claims together. The defendant claims that he was denied due process and the right to confrontation (1) by the court's denial of his motion to release the grand jurors from their oath of secrecy so that they could testify to alleged inconsistent testimony that Rivera had given to the grand jury and (2) by the court's refusal to allow the defendant to show Rivera's bias by introducing extrinsic evidence that Rivera may have been a police informant.

The defendant's objective in attempting to introduce the grand jurors' testimony and evidence of Rivera's role as an alleged police informant was to impeach Rivera. The purpose of impeachment is to undermine the credibility of a witness so that the trier will disbelieve him and disregard his testimony. See generally 3A Wigmore, Evidence (3d Ed. Chadbourn Rev.) § 874. The defendant was presented with a reasonable and probably the most effective method of accomplishing this purpose—to have Rivera's testimony stricken and the jury instructed to disregard it. He declined and now complains that he was hampered in his attempt to accomplish in an indirect way what the court offered to do directly. We are unpersuaded.

Though "this court has stated that the general rule regarding the secrecy of grand jury proceedings is not applicable in cases where the testimony of a witness at the trial is different from his testimony before the grand jury; *State* v. *Coffee,* 56 Conn. 399, 410, 16 A. 151; *State* v. *Fasset,* 16 Conn. 457, 466–67"; *State* v. *Piskorski,* 177 Conn. 677, 709, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); the decision to pierce that secrecy is subject to

the discretion of the trial court. For the testimony to be admissible, the court must be persuaded that, in light of the witness' entire testimony the statements are indeed inconsistent and the inconsistency is substantial and relates to a material matter. Id., 710. Moreover, the court may consider the extent to which other evidence can adequately provide the jury with the theory that the introduction of the grand jury testimony would provide. Id., 712. Accord *Chesney* v. *Robinson*, 403 F. Sup. 306, 310, 310 n.9 (D. Conn. 1975), aff'd without opinion, 538 F.2d 308 (2d Cir.), cert. denied, 429 U.S. 867, 97 S. Ct. 177, 50 L. Ed. 2d 147 (1976).

In the absence of a transcript[9] of the grand jury proceedings, we are unable to determine whether Rivera's testimony at trial was inconsistent with his grand jury testimony. Because we find that the defendant was not deprived of the ability to present these inconsistencies to bolster his theory that Rivera was an unreliable and biased witness, we find no error.

The transcript of the trial reveals that during the cross-examination of Rivera, the defendant's counsel had focused on four alleged inconsistencies[10] between Rivera's testimony at trial and his testimony before the grand jury. When questioned whether his present testimony differed, each time Rivera responded that it did

---

[9] Since this case, the legislature has provided that the grand jury proceedings, excluding the deliberations, shall be transcribed. General Statutes § 54-45a.

[10] In his offer of proof the defendant's counsel presented four inconsistencies that he intended to point out and their importance. He based his allegations on the notes that the defendant took during the grand jury proceedings. First, he contended that Rivera presented to the grand jury three different versions of how the shooting unfolded, but at trial Rivera denied that his description had varied. Second, counsel claimed that at the grand jury Rivera first testified that the defendant took Rivera's and another person's money and later testified that the defendant took everyone's money. At trial Rivera denied presenting differing versions. Third, counsel asserted that Rivera told the grand jury that the defendant ran and did not drive from the scene. At trial Rivera stated that he did not know how the defend-

not. Cf. *Chesney* v. *Robinson,* supra. (State trial court prevented petitioner from cross-examining a critical witness about prior inconsistent testimony before the grand jury testimony and deprived the petitioner of the opportunity to adequately present to the jury his theory that this chief prosecution witness had fabricated his testimony.) After establishing these four areas of alleged inconsistency, counsel then moved on to another subject.[11] Later in the trial, the defendant took the stand and testified that he had been present at the grand jury; see Practice Book § 609 (4); and that he had taken extensive notes of the proceeding.[12] On the basis of those notes he pinpointed how Rivera's testimony at trial differed from his grand jury testimony.[13] Thus, twice the jury heard testimony about Rivera's alleged inconsistent statements. Prior to this, as previously noted, the defendant introduced evidence of Rivera's

ant had fled from the scene. Counsel claimed that these alleged inconsistencies bore on Rivera's ability to observe the shooting and to identify the defendant. Lastly, counsel claimed that Rivera told the grand jury that the victim was like a son to him, but at trial he denied making this statement. Counsel claimed that his grand jury testimony established Rivera's bias.

[11] The transcript reveals that defense counsel was attempting to lay the groundwork for the admission of prior inconsistent statements by Rivera. He indicated that he intended to introduce Rivera's testimony by moving to release the grand jurors from their oath of secrecy and having the grand jurors testify. He never made such a motion and the next day Rivera disappeared. Had he made his motion, it would have been within the trial court's discretion to deny it. Hence, Rivera's disappearance adds nothing to this claim.

[12] The trial court's characterization of the testimony as self-serving is the basis of the defendant's next claim.

[13] We note that allowing the defendant to testify about the grand jury testimony is expressly sanctioned in *Chesney* v. *Robinson,* 403 F. Sup. 306 (D. Conn. 1975), aff'd without opinion, 538 F.2d 308 (2d Cir.), cert. denied, 429 U.S. 867, 97 S. Ct. 177, 50 L. Ed. 2d 147 (1976). In footnote 9 at page 310, the court stated that there were "two possible ways, other than by use of a transcript, in which the inconsistency could both have been shown as a preliminary matter, and proved if necessary, if the witness were to have denied his earlier inconsistent omission. The first would have been to call the grand jurors themselves . . . . The second would have been for the defendant himself to testify to the inconsistency if he so chose."

manslaughter conviction and read to the jury portions of Rivera's testimony on cross-examination at a pretrial suppression hearing to show inconsistencies in his testimony at trial and the unreliability of his identification of the defendant. In addition, counsel had cross-examined other witnesses about Rivera's alleged role in orchestrating their statements to the police and their testimony at trial to show their bias. Moreover, prior to his disappearance, Rivera did testify and expose his demeanor to the jury. The defendant's theory that Rivera had given conflicting testimony and was unreliable and biased was squarely before the jury. See *State* v. *Piskorski,* supra, 712.

The court also did not abuse its discretion by precluding the defendant from introducing extrinsic evidence about Rivera's alleged role as a police informant. In his offer of proof, the defendant could not substantiate this claim; indeed the police officers who were questioned about this denied such a role. As a result, the trial court concluded that this line of inquiry was "remote, far removed, highly speculative. Has nothing to do with the case in progress." The determination of the relevancy and remoteness of evidence is within the sound discretion of the trial court. *State* v. *Carbone,* 172 Conn. 242, 262, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *State* v. *Mahmood,* 158 Conn. 536, 540, 265 A.2d 83 (1969).

Having chosen not to accept the court's offer to strike Rivera's testimony, the defendant was provided ample opportunity to impeach his credibility. If he felt this strategy was unsuccessful, nothing precluded him from making a motion to strike.[14] What he sought instead

---

[14] We express no opinion on whether the trial court would have or should have granted such a motion.

was to embark on what the trial court termed a "fishing expedition" and to foray into tangential areas. This he cannot do.

## IV

When the defendant took the stand, the first part of his testimony focused on Rivera's allegedly inconsistent testimony before the grand jury. When the state's attorney began to object that since there was no transcript, it would be difficult for the state to cross-examine the defendant, the court stated: "Well, it's up to the jury to evaluate the credibility of this witness . . . . In the light that it's self-serving." The defendant contends that, by this comment, the court conveyed to the jury that the defendant was not credible and therefore violated the defendant's right to present his own defense as provided by the sixth and fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution.

Had this comment occurred in the context of the court's charge to the jury, the defendant could hardly complain. It is well settled that in its instruction the trial court may comment on the defendant's interest in the outcome of the trial. *State* v. *Avcollie,* 188 Conn. 626, 636–37, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Maselli,* 182 Conn. 66, 74, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981); *State* v. *Mastropetre,* 175 Conn. 512, 524, 400 A.2d 276 (1978); *State* v. *Bennett,* 172 Conn. 324, 335, 374 A.2d 247 (1977); *State* v. *Jonas,* 169 Conn. 566, 577, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976); *State* v. *Blyden,* 165 Conn. 522, 528, 338 A.2d 484 (1973); *State* v. *Moynahan,* 164 Conn. 560, 574, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973); *State* v. *Guthridge,* 164 Conn. 145, 151, 318 A.2d

87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973); *State* v. *Palko,* 122 Conn. 529, 534, 191 A. 320, aff'd, 302 U.S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937); *State* v. *Schleifer,* 102 Conn. 708, 725, 130 A. 184 (1925); *State* v. *Saxon,* 87 Conn. 5, 22, 86 A. 590 (1913); *State* v. *Fiske,* 63 Conn. 388, 392, 28 A. 572 (1893). It is inappropriate, however, for the court to preface the defendant's or any witness' testimony with such a characterization.

We do not agree, however, that the effect of this comment was to deprive the defendant of his right to present his defense. In the context of the entire trial; see *State* v. *Harris,* 182 Conn. 220, 231, 438 A.2d 38 (1980); such a view is myopic. The "self-serving" comment was preceded by the axiom that it was for the jury to weigh credibility. More importantly, the court instructed the jury that they were the sole judges of the credibility of the witnesses and that they could consider the interest or lack of interest of each witness, including the defendant, in the outcome of the trial. Hence, the court restored the defendant's testimony to the same ground as other witnesses' testimony. We cannot conclude that the jury disregarded these instructions and instead fixated on the court's solitary remark to determine credibility and ultimately guilt.

V

Finally, we consider the defendant's contention that he was deprived of a fair trial because the state failed to provide him with allegedly exculpatory evidence. The facts underlying this claim are as follows: Prior to trial, the defendant filed a motion for discovery, disclosure and inspection in which he requested generally all exculpatory material and specifically in paragraph 10 "[t]he names and addresses of witnesses to the crimes alleged who [sic] the States' Attorney does not intend to call

as witnesses at the trial." The state objected to paragraph 10 and the defendant did not pursue this request.

In the middle of the trial the defendant's counsel inadvertently saw a copy of a police report that stated that on the night of the shooting Officer Joseph Marrero interviewed Carmen Burgos who reported that, although she was present at the El Comerieno Cafe during the shooting, she could not identify the assailant.[15] As a result, the police did not take a statement from her.

The defendant moved to dismiss,[16] arguing that the state's failure to turn over this evidence was in violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and deprived him of a fair trial.[17] The trial court denied the motion on the basis that the evidence was not exculpatory. We agree with the trial court that this was not *Brady* material and hence the state was under no constitutional obligation to provide the defendant with this evidence.

*Brady* v. *Maryland,* supra, 87, imposed a constitutional obligation upon the state to provide the defendant with any material evidence that is favorable to him. See *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); General Statutes § 54-86c; Practice Book § 741; *State* v. *Gradzik,* 193 Conn. 35, 39, 475 A.2d 269 (1984); *State* v. *Falcone,* 191 Conn.

---

[15] The relevant portion of the police report follows. "The officer also interviewed Carmen Burgos, who related to the officer that she was in the cafe when this incident occurred, but that all she say [sic] was that she her [sic] some one yell that there was hold up and for everybody to stay still and not to move. She then heard a shot and heard someone yell for everybody to lay on the floor. Shortly there after she heard several more shots. She could not say for sure who had done it."

[16] We will treat this as a motion for mistrial. See footnote 3, supra.

[17] When the defendant's counsel learned of Carmen Burgos, he tried to locate her but was unsuccessful. After the trial, he located her and, on the basis of her affidavit, moved to set aside the verdict. Since the denial of that motion was not appealed from and is not before us, we cannot consider any of the allegations in the accompanying post trial affidavits.

12, 17, 463 A.2d 558 (1983); *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983); *State* v. *Packard,* 184 Conn. 258, 276–77, 439 A.2d 983 (1981). We fail to see how this evidence was favorable to the defendant. At most it shows that Burgos could not identify the assailant. It in no way undercuts the other eyewitnesses' identifications of the defendant or raises the inference that the defendant was not the assailant.

Even if we assume arguendo that the evidence was exculpatory, we are unconvinced of its materiality. When faced with a request for specific exculpatory evidence, the test for materiality is whether the availability of that evidence "might have affected the outcome of the trial." *United States* v. *Agurs,* supra, 104. We are unable to perceive how Burgos' testimony that she could not identify the assailant would have affected the outcome of the trial. Given that "[t]here is no constitutional requirement that the prosecution . . . make a complete and detailed accounting to the defense of all police investigatory work on a case; *United States* v. *Agurs,* supra, 109; *Moore* v. *Illinois,* 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972)"; *State* v. *Packard,* supra, 278; the state's failure to turn over the police report did not deprive the defendant of a fair trial.

There is no error.

In this opinion the other judges concurred.