STATE OF CONNECTICUT *v.* JOSEPH R. SCARPIELLO
(13175)

Heiman, Spear and Freedman, Js.

---

Argued October 2, 1995—decision released January 30, 1996

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Dennis J. O'Connor*, assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General

Statutes § 53a-55[1] as a lesser included offense of murder, and carrying a pistol without a permit in violation of General Statutes § 29-35.[2] The defendant claims that the judgment should be reversed because (1) the trial court's comments and accompanying "facial gestures" directed toward the defendant's credibility exhibited partiality toward the state and violated the defendant's constitutional rights to due process of law, to a fair and impartial trial by jury, and to present a defense, (2) the trial court violated the defendant's constitutional rights when it improperly instructed the jury on three different

---

[1] General Statutes § 53a-55 provides in pertinent part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 29-35 (a) provides: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33."

statutory components of self-defense, and (3) the trial court, in its charge to the jury, commented on the defendant's credibility in a manner that was not even-handed. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The defendant and Rosalie Scarpiello were married in 1973. At the wedding, Andrew Lupo, the victim, served as the best man. The defendant and Rosalie Scarpiello were divorced in 1978. After the divorce, the defendant left Connecticut and began dividing his time between Florida and California. The defendant eventually remarried and took up residence in California with his new spouse, Frances Scarpiello. Rosalie Scarpiello began a relationship with the victim.

In 1979, the defendant visited Connecticut and met with Rosalie Scarpiello at the Grantmoor Hotel. The couple was engaging in sexual intercourse in one of the hotel rooms when the telephone rang. The defendant answered the telephone and the caller was the victim, who was apparently upset that the defendant and Rosalie Scarpiello were engaging in sexual intercourse.

In the summer of 1987, the defendant returned to Connecticut driving a reddish brown pickup truck registered to Frances Scarpiello. After spending several nights at local motels, the defendant moved into a house owned by the victim's brother at 89 Linnmoore Street in Hartford. The defendant resided in these premises rent free. The victim had previously lived at these premises, but he had been evicted.

On at least four occasions after the defendant's return to Connecticut, the defendant and Rosalie Scarpiello had drinks together. The defendant told Rosalie Scarpiello that he had left his wife and had returned to Connecticut to find a new job and to start over. The defendant also met with the victim, who attempted to help the defendant find a job. On August 13, 1987, the

defendant telephoned Rosalie Scarpiello and asked to meet with her. She declined. The defendant became angry and told her that "no one will ever love you like I did," and, upon completing this statement, the defendant hung up the telephone. At that time, Rosalie Scarpiello was living with the victim and they planned to be married on December 22, 1987.

Rosalie Scarpiello was the owner of Ro's Place, a bar located on Newington Avenue in Hartford. The victim helped Rosalie run the establishment. On August 14, 1987, at approximately 8:30 p.m., Rosalie Scarpiello and the victim arrived at Ro's Place. Prior to arriving at the bar, they were out having a few drinks and getting something to eat. Rosalie Scarpiello remained at the bar until about midnight, when the victim told her to go home. The victim explained that he would stay and close up the bar.

The victim was still at the bar at approximately 1 a.m. on August 15, 1987. He was seated on a bar stool located in the left corner of the bar, angled toward the corner. One of the bar's entrance doors squeaked when it opened, and the squeak of the door was quickly followed by what sounded like firecrackers exploding. The sound, in fact, was the sound of gunshots. Patrons of the bar observed the defendant with a gun in his right hand, standing six or seven feet away from where the victim was sitting. The defendant had fired about six shots at the victim. The victim stood up, put a hand to his chest, said "Oh no," and fell face down on the floor. The defendant fled with the gun still in his hand, and was seen leaving the parking lot of Ro's Place in a reddish brown pickup truck with California plates. The defendant was driving at a high rate of speed with the lights turned off. The vehicle was the pickup truck registered to Frances Scarpiello.

Sergeant Robert Seiler of the Newington police department responded to the call regarding the shooting

because no Hartford police cruiser was close enough to respond quickly. When Seiler arrived, the victim was lying face down on the floor. Seiler did not observe a gun on the floor or in either of the victim's hands. Soon after Seiler's arrival, paramedics arrived on the scene. When the paramedics removed the victim's pants, Seiler heard something hit the floor with a "clunk," and then observed a small gun at the victim's feet.

An autopsy performed on the victim revealed that he had suffered five gunshot wounds, including wounds to the front of his right thigh, the back of his right hand, the front of his right forearm, the right side of his chest, and the right side of his back. The bullets caused injuries to the liver, the right lung and major vessels around the heart. The bullet to the back entered the right side of the victim and traveled in an upward direction to the left side of the body. The bullet damaged the lung and pulverized the liver and was a fatal wound. The shot to the chest caused damage to the major vessels around the heart that was also capable of causing death.

The pickup truck that the defendant was operating at the time of the shooting was found abandoned near the intersection of Dalton and Brown Streets in Hartford. The Hartford police obtained an arrest warrant for the defendant but they could not locate him in the Hartford area. The defendant was apprehended by the Federal Bureau of Investigation (FBI) and local police in Glendale, California, and was returned to Connecticut on June 20, 1989. At the time of his arrest, the defendant gave a voluntary statement to FBI agents that he felt he had shot the victim in self-defense, that he had never seen a gun in the victim's hand although he assumed that the victim was carrying one, and that he had prevailed in a western style shoot-out because he was faster on the draw than was the victim. The defendant also told the agents that he had thrown his gun into some bushes.

The defendant's case proceeded to trial on November 2, 1990. At trial, the state and the defendant stipulated that as of August 15, 1987, the defendant did not have a proper pistol or revolver permit issued to him by the city of Hartford. The defendant also admitted that he shot the victim, but claimed that he acted in self-defense pursuant to General Statutes § 53a-19.[3]

The defendant testified as follows. After he returned to Connecticut in 1987, he stayed in motels for several nights and then moved into the apartment on Linnmoore Street owned by the victim's brother. The defendant was aware that the victim had previously lived there and that the victim had been evicted. The defendant

[3] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

was also aware of the victim's violent propensities and that the victim carried a gun. The defendant had heard that the victim's gun had been taken away from him at a bar after he had threatened to shoot his brother over a property dispute. Additionally, the defendant stated that the victim was jealous and resentful because the defendant was back in town. According to the defendant, the victim was also becoming angry because the patrons at Ro's Place were making comments about the fact that Rosalie Scarpiello and the defendant had been seen together.

The defendant testified that the animosity between him and the victim was increasing. Consequently, the defendant felt that it was necessary to meet with the victim. The defendant and the victim met for breakfast on two separate occasions, the second meeting taking place two days before the shooting. The first meeting was amicable. The second meeting was not amicable, and the victim accused the defendant of sneaking around with Rosalie Scarpiello. According to the defendant, the victim asked whether the defendant had come back to "break his balls." After the second meeting, the defendant claimed to have grown a little "leery" of the victim and testified that he became apprehensive about his relationship with the victim.

The defendant testified that on the evening of August 14, 1987, he called Ro's Place from a pay telephone to speak with Rosalie Scarpiello about a possible loan. According to the defendant, the victim answered the telephone and said to the defendant, "you motherfucker, don't ever call this bar again or you're dead." After this conversation, the defendant was extremely concerned that the victim would be lying in wait for him on Linnmoore Street. The defendant knew that the victim had previously lived in the same house, and the defendant was concerned that the victim could gain access to the house in some manner. The defendant

decided to sit in his truck and think about what he should do. He finally decided to go to Ro's Place to try to work things out with the victim. He drove to the bar, parked the truck in the back of the parking lot and locked the door. The defendant had a pistol in his vehicle, and he took the pistol and placed it in his pants pocket under his shirt as a "precautionary" measure, just in case the victim "went a little wacky." The defendant claimed that he always carried a pistol in his truck.

The defendant claimed that he entered the bar and that the victim, who was seated on a bar stool, spotted the defendant and immediately began to get off of the stool. According to the defendant, the victim faced the defendant and said "you fucker," swung the stool in front of him, dropped into a crouched position, and held up the stool as a shield. The defendant observed the victim's hand move toward his pocket, and at that moment, the defendant saw the handle of a gun. The defendant testified that he fired his gun in the general direction of the victim in an attempt to incapacitate him. According to the defendant, the victim's gun and the victim both fell to the floor, and when the victim slumped to the floor, the defendant stopped firing. The defendant admitted that he fired the first shot, but he did not remember how many shots he fired.

The defendant asserted that after the shooting he turned and walked out of the bar and went to the truck. He exited the parking lot without turning on the vehicle's lights, claiming that he was in such a daze that he forgot to do so. He fled because he was afraid that the victim's family would seek revenge. Furthermore, because a member of the victim's family was a Hartford police officer, the defendant felt that the investigation of the shooting would be biased and that he would not receive a fair trial.

The defendant further asserted that he drove the truck until it ran out of gas, and then abandoned the

truck on a side street near Goodwin Park in Hartford. He also stated that he threw away the gun. The defendant then hitchhiked to New Haven. From New Haven, he took a bus to New York. He then went to Fort Myers, Florida, where he worked on a shrimp boat. The defendant became concerned that the police might look for him in the Fort Myers area because his former wife had relatives in that area. The defendant finally returned to California where he was eventually apprehended and arrested.

The jury acquitted the defendant of the murder count and found him guilty of the lesser included offense of manslaughter in the first degree. The jury also found the defendant guilty of carrying a pistol without a permit.

I

The defendant first claims that the trial court's comments and accompanying facial gestures directed toward the defendant's credibility exhibited partiality toward the state and violated the defendant's constitutional rights to due process of law, to a fair and impartial trial by jury, and to present a defense.[4] We are unpersuaded.

We first address the aspect of the defendant's claim regarding the trial court's facial gestures. At trial, defense counsel complained that the trial court "mad[e] faces" and was "grimacing" while defense counsel questioned the defendant about the defendant's intentions upon entering Ro's Place at the time of the shooting. The trial court, however, neither denied nor acknowledged

---

[4] The defendant has failed to provide us with a separate analysis of his claim under the Connecticut constitution, and we therefore choose not to review this claim under the Connecticut constitution. *State* v. *Francis*, 228 Conn. 118, 122 n.3, 635 A.2d 762 (1993); *State* v. *Walker*, 33 Conn. App. 763, 766, 638 A.2d 1084, cert. denied, 229 Conn. 913, 642 A.2d 1209 (1994). This failure, however, does not mean that we are not able to afford review of such a claim if we decide to do so. *State* v. *Hoeplinger*, 27 Conn. App. 643, 652 n.2, 609 A.2d 1015, cert. denied, 223 Conn. 912, 612 A.2d 59 (1992).

that it had engaged in such conduct. Other than the complaint by defense counsel, the transcript is silent with respect to the trial court's facial expressions during defense counsel's questioning regarding the defendant's intent. Consequently, the record is not adequate for us to review the defendant's claim regarding the trial court's facial expressions. Therefore, "[w]e cannot conclude that the defendant has shown that the trial court's demeanor or conduct denied him a fair trial." *State* v. *Boone*, 15 Conn. App. 34, 49–50, 544 A.2d 217, cert. denied, 209 Conn. 811, 550 A.2d 1084 (1988) (defendant unable to show on appeal that trial court laughed or snickered and could not prevail on claim that such conduct precluded him from obtaining fair trial).

We next address the defendant's assertion that the trial court made inappropriate comments in its ruling on whether the defendant should be permitted to testify as to his intentions upon entering Ro's Place at the time of the shooting. On direct examination, defense counsel asked the defendant whether he intended to kill the victim. The state's attorney objected to the question and the trial court sustained the objection.[5] When defense counsel made a second attempt to question the defendant as to whether he intended to kill the victim, the state's attorney again objected. The trial court, in the course of its ruling on the state's objection, permitted defense counsel to ask the question, but commented

---

[5] The questioning was as follows:

"[Defense Counsel]: Now, when you drove to the bar did you have an intention to kill Andrew Lupo?

"[Defendant]: None.

"[State's Attorney]: Objection. That's self-serving.

"[Defense Counsel]: His intention is what the jury's going to have to decide.

"[State's Attorney]: That's self-serving and leading.

"The Court: Well, it's both.

"[Defense Counsel]: I asked him if he had an intention. I claim it.

"The Court: I'm going to sustain the objection. You can rephrase the question. It was leading."

disparagingly on the "worth" of the testimony and stated that it was going to give the jury an instruction on credibility.[6] Subsequently, the defendant asked for a short recess. The jury was excused and the defendant moved the trial court for a mistrial. The trial court denied the motion. When the jury returned to the courtroom, the trial court, sua sponte, gave an instruction with respect to its colloquy with defense counsel. As part of the instruction, the trial court directed the jury to disregard the comments that the trial court made during the direct examination of the defendant.[7]

---

[6] The remarks of the trial court that the defendant claims were improper occurred during the direct examination of the defendant as follows:

"[Defense Counsel]: All right. When you fired those shots, was it your intention to kill him?

"[State's Attorney]: Objection again. Its self-serving and leading.

"[Defense Counsel]: I claim it. That's the very, very issue that the jury has to determine. He's the most capable person to comment on that in this whole room, Your Honor.

"The Court: Well, for what its worth. He can comment on it but I still have to give the instruction to the jury.

"[Defense Counsel]: Well, may I ask that the court retract that remark, for what its worth?

"The Court: I still have to give the jury the instruction on credibility.

"[Defense Counsel]: I realize that. Yes, Your Honor.

"The Court: All right. So that's why I'm allowing him to answer it.

"[Defense Counsel]: Well, does that preclude him saying it?

"The Court: No, it doesn't preclude him from saying anything.

"[Defense Counsel]: I'm asking the court then, with all respect—

"The Court: I'm allowing him to answer it.

"[Defense Counsel]: Why do we have to have comments every time I ask that question?

"[State's Attorney]: Because you're not asking it in the proper form.

"[Defense Counsel]: Well, the court just ruled that I can.

"The Court: Let him answer it. You know.

"[Defense Counsel]: Did you intend to kill him?

"[Defendant]: No, I did not."

[7] The trial court instructed the jury as follows: "All right. Ladies and gentlemen of the jury, there was a colloquy between [defense counsel] and myself just preceding the recess, and it revolved around a question he asked as to [the defendant's] intent. I'm going to ask you to disregard everything that was said by the court during the course of that colloquy because I was wrong. He is allowed to inquire into [the defendant's] intent. I have sustained the objection to the form of the question and I've given [defense counsel]

The state concedes that the trial court's comment regarding the "worth" of the defendant's testimony and the trial court's statements that it was going to give an instruction to the jury on credibility were inappropriate.[8] While we agree that the statements at issue were inappropriate and should not have been made, this does not end our inquiry. In determining whether a trial court's comments directed at the credibility of a testifying defendant deprived the defendant of his constitutional rights, our Supreme Court has examined such comments in the context of the entire trial. See *State v. Maldonado*, 193 Conn. 350, 366–67, 478 A.2d 581 (1984). We find that in the context of the entire trial, the comments of the trial court did not deprive the defendant of his constitutional rights.

Our determination that the defendant's constitutional rights have not been violated is heavily influenced by the fact that the trial court, in its instructions after the recess and in its charge to the jury, "restored the defendant's testimony to the same ground as other witnesses' testimony." Id., 367. After the jury returned to the courtroom following the short recess requested by the defendant, the trial court immediately made reference to the colloquy that preceded the recess and instructed the jury to "disregard everything that was said by the court during the course of that colloquy

---

the opportunity to continue, and if [he] wants to inquire into the area of intent he may. But if the form is improper I'm going to have to sustain the objection. Okay, [defense counsel]?"

Defense counsel then continued with his direct examination of the defendant regarding his intention with respect to the shooting:

"[Defense Counsel]: . . . [W]hen you went into the bar did you intend to shoot [the victim]?

"[Defendant]: Definitely not.

"[Defense Counsel]: And after you fired the shots or while you were firing the shots, was it your intention to kill [the victim]?

"[Defendant]: No, that was not my intention."

[8] See footnote 6.

because I was wrong."[9] The trial court also explained that it had sustained the state's objection to the form of defense counsel's question about the defendant's intent at the time of the shooting, and that defense counsel was free to question the defendant about such intent as long as the form of the question was proper. The defendant neither objected to this instruction nor requested that the trial court amplify or extend its statement in any way. After the trial court gave the instruction and inquired, "Okay, [defense counsel]?" defense counsel immediately resumed questioning. Defense counsel proceeded to ask the defendant, "when you went into the bar did you intend to shoot [the victim]?" The defendant answered, "Definitely not." The state's attorney did not object to the question and the trial court did not intervene.

In its charge to the jury at the close of trial, the trial court admitted that it had been wrong during the colloquy about the defendant's right to testify as to his intent at the time of the shooting, and that the defendant had the right to testify about such intent.[10] In its charge, the trial court also properly instructed the jury as to the differing responsibilities of the court and the jury. The court charged that the jury is the sole and absolute judge of the facts of the case, and that anything the court says about the facts is not binding on the jury. Moreover, the trial court charged that the jury is the

---

[9] See footnote 7.

[10] The trial court's charge concerning this point was as follows: "A person may take the stand and testify as to what his or her intention was. And incidentally, I want to reiterate here that the defendant had a perfect right to get on the stand and say what his intent was. You may recall there was a colloquy between me and the defense attorney about that issue. I was wrong and they were right, and he is entitled to take the stand and testify to his intent. Now you may believe that testimony or not according to whether or not you find that it warrants belief. And that's going to go back to the credibility you attach to the defendant's testimony after you've weighed all the factors that I've given you."

exclusive judge of the credibility of witnesses and that it is the jury's duty to determine the weight to be given to the testimony of any witness.

We are satisfied that the trial court's instruction candidly admitting that it was wrong and to disregard its comments, coupled with its charge regarding the defendant's right to testify and the proper roles of the trial court and the jury concerning fact-finding and assessments of credibility, taken in the context of the whole record, adequately protected the defendant's constitutional rights. The trial court acted promptly and firmly to dispel any possible prejudice or import that the jury could ascribe to the trial court's improper remarks. The trial court's forceful actions thus restored the defendant's testimony to the same level playing field as that of any other witness. *State* v. *Maldonado*, supra, 193 Conn. 367. We cannot conclude that the jury ignored the instructions and the charge of the trial court and "instead fixated on the court's [remarks] to determine credibility and ultimately guilt."[11] Id.

The defendant's first claim is without merit.[12]

## II

The defendant next claims that the trial court violated his state[13] and federal constitutional rights when it improperly instructed the jury on three separate components of self-defense. The defendant posits that his

[11] We note that the jury obviously gave credit to at least some of the defendant's testimony, since he was acquitted of the charge of murder and convicted of the lesser included offense of manslaughter in the first degree.

[12] We note that the defendant asserts that the impropriety of the trial court's remarks cannot be corrected by the curative instruction because of the trial court's uneven treatment of the defendant as a witness in its charge to the jury. Since we conclude that the trial court's charge to the jury concerning the testimony of the defendant as a witness was not improper, we do not agree that the curative instruction did not correctly cure the statements of the trial court. See part III of this opinion.

[13] See footnote 4.

rights to due process of law, to present a defense and to a fair trial were violated. We do not agree.

We begin by examining the fundamental principles of law that govern our review of this claim. It is a fundamental element of due process that a defendant charged with the commission of a crime be permitted to establish a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). Furthermore, "[a] person is entitled to a proper jury instruction on the elements of every defense that the legislature has created so that the jury may determine whether the state has sustained its burden of disproving the defense beyond a reasonable doubt." *State* v. *Harrison*, 32 Conn. App. 687, 692, 631 A.2d 324, cert. denied, 227 Conn. 932, 632 A.2d 708 (1993). It is the function of the jury charge to assist the jury in applying the law correctly to the facts that the jury finds to be established. Id.

"An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . In either instance, [t]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal

quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995).

A

We first address the defendant's challenge to that portion of the trial court's self-defense charge relating to the degree of force used by the defendant. The defendant asserts that the trial court misguided the jury when it instructed that "reasonable force" is "that force which an average person of ordinary intelligence and like circumstances would judge to be necessary to prevent injury and no more." The defendant contends that this particular aspect of the charge improperly directed the jury to employ a simple objective standard in determining whether the defendant reasonably believed it necessary to use deadly physical force to defend himself. Thus, the defendant posits that the instruction failed to explain adequately to the jury the necessity of examining and evaluating the defendant's subjective belief as to the amount of force necessary to defend himself. The state, however, responds that taking the charge as a whole, the trial court sufficiently instructed the jury as to the law governing the degree of force that may be justifiably used in self-defense. According to the state, the charge properly conveyed to the jury that the defendant's subjective perspective must be considered in evaluating the degree of force used by the defendant. Although we agree with the defendant that an instruction employing only a simple objective standard would not withstand constitutional challenge in isolation; see *State* v. *Williams*, 25 Conn. App. 456, 464, 595 A.2d 895, cert. denied, 220 Conn. 916, 597 A.2d 339 (1991); we are satisfied that from the facts of the case, the issues presented, and the charge as a whole, there is no reasonable possibility that the trial court's instruction misled the jury to an improper verdict. *State* v. *Prioleau*, supra, 235 Conn. 285.

A person may justifiably use deadly physical force in self-defense pursuant to § 53a-19 (a) "only if he *reasonably* believes *both* that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, *and* (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a 'subjective-objective' one."[14] (Citations omitted; emphasis in original.) Id., 285–86.

"The subjective-objective inquiry into the defendant's belief regarding the necessary degree of force requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . . The jury's initial determination, therefore, requires the jury to assess the veracity of witnesses, often including the defendant, and to determine whether the defendant's account of his belief in the necessity to use deadly force at the time of the confrontation is in fact credible. This probe into the defendant's actual state of mind clearly demonstrates the function of the jury in [its] evaluation of the self-defense claim." (Citations omitted; internal quotation marks omitted.) Id., 286–87.

"If the jury determines that the defendant had not believed that he had needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, how-

---

[14] It is the second requirement that is in issue here.

ever, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether *that belief* was reasonable, from the perspective of a reasonable person in the defendant's circumstances. . . . Thus, if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19." (Citations omitted; emphasis in original.) Id., 287.

The self-defense issue in this case was marked by the divergent testimony of the witnesses present at the time of the shooting. While no witness observed the defendant enter the premises, there was evidence that the door through which the defendant entered made a squeaking noise that was heard by several patrons and that almost as soon as the door squeaked the defendant fired at the victim. The defendant admitted that he fired first, but he testified that he fired in response to his observation of the victim getting off of a bar stool and reaching for a pocketed gun, which eventually fell out of the victim's hand after the victim was shot. There was also testimony, however, that when the victim's body was examined at the scene of the shooting, his weapon had not been drawn.

In our examination of the trial court's charge as a whole, we conclude that the charge adequately alerted the jury that it must consider both subjective and objective factors in determining whether the defendant reasonably believed that deadly force was necessary to repel the victim's alleged attack. In this regard, the trial court instructed that "the danger or apparent danger claimed by the defendant *is to be determined from his standpoint* at the time of the attack and under all the existing circumstances. The act leading to the defendant's claim of self-defense may not be an actual threat

or assault. The test is not what the other person actually intended, but what the aggressor's act caused the defendant to reasonably believe was his intention." (Emphasis added.) Furthermore, the trial court noted that "the defendant's belief of danger must be honest and sincere." Thus, the trial court clearly alerted the jury that it must evaluate the defendant's subjective beliefs as to the degree of force necessary to protect himself. After these instructions, the trial court described reasonable force as the amount of force that would be used by an average person. The court stated: "In deciding whether the force used in this case is reasonable, you may examine such factors as the physical attributes of the parties involved, including age, sex, height and weight. The use of deadly force is reasonable only to resist a threat of death or serious physical harm. You people are going to have to make some decisions whether or not such a threat existed." Thus, the trial court also alerted the jury that it must determine whether the defendant's perception of danger was objectively reasonable. Finally, in a supplemental charge, the trial court reiterated the need to consider both subjective and objective factors. The trial court instructed that the defendant's claim of self-defense would fail if the state proved, inter alia, that the defendant "did not *really believe* that he was in imminent danger" *and* that he "had no *reasonable grounds to believe* that he was going to have to act in self-defense." (Emphasis added.) This particular instruction essentially mirrors the interpretation of § 53a-19 that our case law requires. See id., 285–87; *State* v. *Williams*, supra, 25 Conn. App. 464. Thus, the charge sufficiently apprised the jury that the test for self-defense is both subjective and objective. *State* v. *Williams*, supra, 466. It is therefore "not reasonably possible that the jury could have concluded that its inquiry was to be made

solely in an objective manner." *State* v. *Prioleau*, supra, 235 Conn. 290.[15]

## B

We next address the defendant's attack on that portion of the trial court's self-defense charge relating to the concept of "initial aggressor." The defendant asserts that the trial court failed to instruct the jury specifically that the first person to use physical force was not necessarily the initial aggressor. According to the defendant, the trial court therefore misled the jury to believe that in a self-defense case, the first person to use force, such as the defendant here, must be considered the initial aggressor.[16] We do not agree.

The defendant relies on *State* v. *Jiminez*, 228 Conn. 335, 636 A.2d 782 (1994) in support of this claim. The defendant's reliance on *Jiminez* is misplaced. In that case, the trial court affirmatively charged the jury that an initial aggressor is necessarily the person who first uses physical force; id., 338; and our Supreme Court determined that such a charge constituted reversible error. Id., 342. In *Jiminez*, however, our Supreme Court "did not indicate that a trial court must *explicitly state* that the 'initial aggressor' is not necessarily the first person to use force." (Emphasis added.) *State* v. *Prioleau*, supra, 235 Conn. 293 n.18.

We rely on our Supreme Court's opinion in *State* v. *Prioleau*, supra, 235 Conn. 293, to resolve this claim.

[15] We also note, as we did in *State* v. *Williams*, supra, 25 Conn. App. 465, that "the principal factual issues did not turn on the subtleties of the law of self-defense for their proof. The degree of force used by the defendant was not the central focus of the disputed testimony. Rather, the case presented to the jury concerned the question of determining what exactly happened leading up to the point that the defendant used force against the deceased."

[16] Generally, "a person is not justified in using physical force in self-defense if he is the initial aggressor. . . . Therefore, if the jury found that the defendant was the [initial] aggressor in his encounter with the victim, he could not prevail on his claim of self-defense." (Citations omitted.) *State* v. *Jiminez*, 228 Conn. 335, 339–40, 636 A.2d 782 (1994).

In *Prioleau*, as in the present case, "[a]lthough the trial court did not specifically instruct the jury that the initial aggressor is not necessarily the first person actually to employ the use of force, that premise was implicit throughout the entire self-defense instruction." Id. The trial court clearly instructed the jury that "[a] person is justified in the use of reasonable physical force on another when he reasonably believes that such force is necessary to protect himself or another person from the use *or impending use* of physical force [by] another." (Emphasis added.) The trial court also instructed the jury that it must find the defendant not guilty on the ground of self-defense if the state failed to prove beyond a reasonable doubt that "the defendant did not believe that he was in *imminent* danger of death or injury and that the use of force was not necessary to protect himself." (Emphasis added.) The trial court also referred to the danger or *apparent* danger that the defendant claimed to have faced, and also correctly paraphrased the language of § 53a-19 (a) that the defendant "may justifiably use deadly force only if he reasonably believed that the other person was using *or about to use* deadly physical force" or "the other person was inflicting *or about to inflict* great bodily harm." (Emphasis added.)[17]

Thus, as was the Supreme Court in *Prioleau*, we are persuaded that "[i]n light of the entire self-defense instruction . . . the trial court sufficiently apprised the jury that it could have found the defendant not guilty of murder [or manslaughter] on the ground of self-defense even if the defendant was the first person actually to have used physical force, so long as the defendant had reasonably believed that the victim was about to use deadly physical force against him." Id., 293–94.

---

[17] The trial court's instructions quoted in this paragraph are nearly identical to the instructions approved by the Supreme Court in *State* v. *Prioleau,* supra, 235 Conn. 293.

## C

The defendant's last claim with respect to the trial court's self-defense charge relates to the trial court's instruction on the duty to retreat. The defendant claims that the trial court committed reversible error when it failed to instruct that § 53a-19 (b) requires a defendant to retreat rather than use deadly physical force only where the defendant *knows* that he can retreat with complete safety. The defendant concedes that he neither requested an instruction concerning the duty to retreat nor excepted to the trial court's charge concerning the duty to retreat. Thus, the defendant seeks review of this issue under the well established principles of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or under the plain error doctrine. Practice Book § 4185.

The trial court charged the jury that "[t]he law does not encourage the use of deadly force, and in most circumstances a person must retreat from a perceived harm if he's able to do so with complete safety." Later, the trial court also stated, "I don't think there is any retreating in this case, because I think, based upon the defendant's own testimony, that there was no time for retreat."

This court has already held that a charge on the duty to retreat is flawed if it fails to instruct the jury to consider the subjective component of the duty to retreat: the defendant's knowledge of his ability to retreat. *State* v. *Tate*, 34 Conn. App. 610, 617, 642 A.2d 1223 (1994). The state concedes, and we agree, that the trial court's charge failed to address this subjective component properly. Id., 617. Nevertheless, we find that such failure constituted harmless error. *State* v. *Quintana*, 209 Conn. 34, 46, 547 A.2d 534 (1988).

In *State* v. *Quintana*, supra, 209 Conn. 47–48, our Supreme Court determined that under the circum-

stances of that case, the failure of the trial court to charge on the subjective component of the duty to retreat was harmless error, because " '[t]he principal factual issues . . . were not classically dependent upon [the subtleties of the law of self-defense] for their proof, as is true in cases where the principal factual issue is the . . . [defendant's subjective knowledge of the availability of safe escape].' " We conclude that the trial court's failure to charge on the subjective component was harmless for the same reasons as those set forth in *State* v. *Quintana,* supra, 47–48.

Here, the issue of retreat was not presented to the jury as a significant factor to consider in the resolution of the defendant's self-defense claim.[18] The jury was presented with two conflicting versions of the shooting, neither of which implicated the duty to retreat. The jury's principal task was to determine which version of the event was more plausible. *State* v. *Tate,* supra, 34 Conn. App. 618. Thus, because the issue of retreat in this case was relatively insignificant, we find that the self-defense instruction, read as a whole, "although not in strict accordance with § 53a-19 (b), presented the case to the jury in such a manner that no injustice resulted." Id. We conclude that the defendant cannot satisfy the fourth prong of *Golding* because the improper instruction constituted harmless error beyond a reasonable doubt.

### III

The defendant's last claim is that the trial court improperly commented on the defendant's credibility

---

[18] Because the duty to retreat was not a significant issue at trial, we note that our Supreme Court's opinion in *State* v. *Ash,* 231 Conn. 484, 498, 651 A.2d 247 (1994), is not controlling. In that case, the Supreme Court rejected the state's reliance on *State* v. *Quintana,* supra, 209 Conn. 46–48, because "[u]nlike the circumstances in *Quintana,* the state's case [in *Ash*] hinged substantially on whether the defendant, at some point either prior to or during the fatal altercation, failed to retreat within the meaning of the self-defense statute." *State* v. *Ash,* supra, 498.

"in a manner that was not evenhanded." The defendant acknowledges that the trial court correctly instructed the jury that a witness' interest in the outcome of a case may be considered in determining that witness' credibility.[19] The defendant asserts, however, that in four separate instances, the trial court improperly "singled out" the defendant's interest in the outcome of the case as compared to the other witnesses' interests in the outcome of the case.[20] The defendant posits that

[19] The trial court charged the jury on the issue of credibility of witnesses as follows: "Now there is another area where you have the sole and exclusive jurisdiction to make certain findings, and that deals with the credibility of witnesses. Only you people can determine which witnesses are credible and which are not credible. The credibility of witnesses and the weight to be given is—to their testimony are matters which are peculiarly your function to determine . . . . And in weighing the testimony of a witness you should consider his appearance on the stand, you try to seize him up. And you have in mind all those little circumstances which point to his truthfulness or his untruthfulness. You should consider any possible bias or prejudice that witness may have, whether for or against the accused or the state. Witnesses' interest or lack of interest of whatever sort in the outcome of the trial, his ability to observe facts correctly and to remember and relate them truly and accurately. You should test the evidence the witness gives you by your own knowledge of human nature and the motives which influence and control human nature."

[20] The defendant belatedly claims that the following four instances constitute improper comment:

(1) After discussing the credibility of witnesses in general, the trial court specifically addressed the issue of the credibility of the defendant as a witness as follows: "Now, I'm going to address now as to the accused taking the stand as a witness. Now, an accused does not—is not obliged to take the witness stand in his own behalf. On the other hand, the accused has a perfect right to do so, as this particular defendant has done. In weighing the testimony he has given you, you should apply the exact same principles by which the testimony of other witnesses are tested, and that necessarily involves a consideration of interest in the outcome of the case. You'll consider the importance to the accused of the outcome of the trial and his motives on that account for not telling the truth. An accused person, having taken the witness stand, stands before you just like any other witness and is entitled to the same consideration and must have his testimony measured in the same way as any other witness, including, however, his interest in the verdict you are going to be asked to render."

(2) In the course of discussing intent as an element of the crime of murder, the trial court stated: "Now intent is a mental process. A person may take

this constituted a violation of rights guaranteed to him by the sixth and fourteenth amendments to the constitution of the United States and by article first, § 8, of the Connecticut constitution.[21] The defendant concedes that this claim was not properly preserved for review by this court, and accordingly seeks review under the aegis of *State* v. *Golding*, supra, 213 Conn. 239–40.

" 'We have treated the basic claim that specific mention of the defendant's interest infringes upon his right to a fair trial as falling within the claimed deprivation of a "fundamental constitutional right" . . . [and] [w]e must, therefore, examine the nuances of language belatedly relied upon by the defendant, only for the purpose of determining whether they are significant enough to have affected the fairness of his trial.' " *State* v. *Williams*, 220 Conn. 385, 396–97, 599 A.2d 1053 (1991), quoting *State* v. *Mack*, 197 Conn. 629, 637, 500 A.2d 1303 (1985).

The defendant's assertion that the trial court's four references to the defendant's interest in the outcome

the stand and testify as to what his intention was. And incidentally, I want to reiterate here that the defendant had a perfect right to get on the stand and say what his intent was. You may recall there was a colloquy between me and the defense attorney about that issue. I was wrong and they were right, and he is entitled to take the stand and testify to his intent. Now you may believe that testimony or not according to whether or not you find that it warrants belief. And that's going to go back to the credibility you attach to the defendant's testimony after you've weighed all the factors that I've given you."

(3) In discussing the defendant's claim of self-defense, the trial court stated in part: "Again, that was the defendant's testimony. And whether you accept it or not is up to you. You apply the standards of credibility to his testimony just as you do for all the other witnesses, as I said before. And you do consider his interest in the outcome of the case."

(4) In discussing the issue of evidence relating to consciousness of guilt, the trial court stated in part: "An accused person [is not] obliged to take the witness stand in his own behalf. On the other hand—well, I've already charged you on that, credibility. You can—as far as the defendant taking the stand, a factor you can [consider in] determining his credibility is his interest in the outcome of the case."

[21] See footnote 4.

of the case were not "evenhanded" is not supported by the record. The trial court specifically instructed the jury that in weighing the testimony of the defendant, the same principles should be applied as are applied to any other witness' testimony. Similarly, the trial court carefully reiterated to the jury that the defendant stands before it like any other witness and is entitled to have his testimony measured in the same way as that of any other witness. The trial court further reminded the jury that it must weigh "all the factors" that the trial court has enunciated regarding credibility. The trial court also prudently noted that the same standards of credibility attached to the defendant's testimony as attached to that of any other witness. Finally, the trial court reminded the jury of the trial court's general charge on credibility.

Thus, the continual emphasis by the trial court was that the testimony of the defendant was to be evaluated in the same fashion as that of the other witnesses. *State v. Williams*, supra, 220 Conn. 397. In such situations, both our Supreme Court and this court have held that a defendant's claim of lack of evenhandedness is without merit. Id.; *State v. Colon*, 37 Conn. App. 635, 640–41, 657 A.2d 247, cert. denied, 234 Conn. 911, 660 A.2d 354 (1995). "We have repeatedly approved the use of similar language and do not find its use here unduly repetitive or transcending the bounds of evenhandedness." *State v. Williams*, supra, 397; *State v. Colon*, supra, 640. The claim of the defendant is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.