## STATE OF CONNECTICUT *v.* JOSEPH R. PRANCKUS III
### (AC 21265)

Lavery, C. J., and Bishop and Dupont, Js.

Argued October 31, 2002—officially released February 11, 2003

*Auden Grogins*, special public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Dennis J. O'Connor*, senior assistant state's attorney (state).

*Opinion*

LAVERY, C. J. The defendant, Joseph R. Pranckus III, appeals from the judgment of conviction, rendered after a jury trial, of two counts of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1).[1] On appeal, the defendant claims that the state did not disprove beyond a reasonable doubt his justification defense of use of physical force in defense of a person

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

pursuant to General Statutes §§ 53a-16[2] and 53a-19.[3] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 4, 1998, a party was held at 69 House Street in Glastonbury. The house was rented by Debra Malcomson, who lived there with her daughter, Samantha Witnauer. Malcomson was vacationing on Cape Cod and had left the defendant to look after her house and Samantha. Richard Lupacchino, Samantha Witnauer's boyfriend at the time, and Damien McLaughlin organized the party. People first arrived at 69 House Street

[2] General Statutes § 53a-16 provides: "In any prosecution for an offense, justification, as defined in sections 53a-17 to 53a-23, inclusive, shall be a defense."

[3] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of combat by agreement not specifically authorized by law."

at about 10 p.m. The greatest number of people at the party at any time was between fifteen and twenty-five. The majority of partygoers were teenagers, with the exception of McLaughlin and the defendant. During the party, many of the participants drank alcohol and some smoked marijuana.

Earlier that day, Karen Witnauer, Samantha Witnauer's sister, and the defendant left 69 House Street to view fireworks. They had no knowledge that the party was taking place, nor had the defendant given permission for a party to occur. Karen Witnauer and the defendant arrived back at 69 House Street in Karen Witnauer's car sometime after 11 p.m. Located in the trunk of the car was the defendant's backpack, which included the defendant's clothes. Samantha Witnauer and Lupacchino approached Karen Witnauer's car to inform them of the party and to see if they had a problem with it continuing. The defendant indicated that he did not have a problem with the party as long as it was not loud and people were out at a reasonable time. The defendant then mingled at the party with others, smoked marijuana, drank alcohol and lit fireworks in the backyard.

By 3 a.m. on July 5, 1998, the majority of people had left the party. The remaining people included the defendant, Karen Witnauer, Samantha Witnauer, Lupacchino, McLaughlin, Gordon Anderson, Peter Doucette and the two victims, Bryan Judd and Paul Potkaj. Anderson, Doucette, Judd and Potkaj were in the kitchen where they continued to drink, arm wrestle and break dance. Shortly thereafter, the defendant entered the kitchen and began yelling and swearing at the boys to leave. Judd approached the defendant in an attempt to calm him.

The defendant then punched Judd in the face. Judd responded by punching the defendant in the face. A

brief fight ensued between Judd and the defendant during which a shelf with ceramic mugs fell on the floor and shattered. Doucette, Anderson, and Potkaj attempted to break up the fight. Anderson and Potkaj grabbed Judd by his arms to restrain him while Doucette came up behind the defendant and wrapped his arms around him to stop the fight. The defendant broke free from Doucette and attacked Judd again. Judd freed himself from Potkaj and Anderson in response to the defendant's attack and punched the defendant again. That punch caused the defendant to stumble backward into the kitchen counter. The defendant then picked up a kitchen knife with an eight inch blade from the counter and strode six feet from the counter toward Judd, swinging and stabbing with the knife. As the defendant was stabbing forward with the knife, Potkaj was standing next to Judd. The defendant ultimately stabbed Judd and Potkaj twice apiece.

Judd suffered a seven inch deep stab wound to the left side of his chest and an another wound from the knife to the left side of his back. Potkaj received a seven and one-half inch deep wound to the right side of his chest and a superficial incision wound on the left side of his back around his shoulder blade. Everyone remaining at 69 House Street ran outside, but the defendant remained inside where he called the police. Both Potkaj and Judd collapsed on the ground from their injuries. Potkaj eventually died from the seven and one-half inch stab wound to the right side of his chest, and Judd died from the seven inch stab wound to the left side of his chest. The defendant was arrested on the scene and later treated for a laceration over his left eye and a broken left orbital bone.

The defendant's sole claim on appeal is that the state failed to disprove beyond a reasonable doubt his justifi-

cation defense pursuant to §§ 53a-16 and 53a-19.[4] The defendant failed to preserve his insufficiency of the evidence claim at trial and seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "[A]ny defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. Accordingly, we conclude that no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Internal quotation marks omitted.) *State* v. *Padua*, 73 Conn. App. 386, 392, 808 A.2d 361 (2002).

"[T]he standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence. . . . In reviewing [a] sufficiency [of evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier of fact's] verdict of guilty. . . . We are mindful as well that [t]he state has the burden of disproving the defense of justified use of force . . . beyond a reasonable doubt. . . . Whether the defense of the justified use of force, properly raised at trial, has been

---

[4] The defendant does not appeal from the propriety or language of the jury instructions concerning self-defense.

disproved by the state is a question of fact for the jury, to be determined from all the evidence in the case and the reasonable inferences drawn from that evidence. . . . As long as the evidence presented at trial was sufficient to allow the jury reasonably to conclude that the state had met its burden of persuasion, the verdict will be sustained." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, 71 Conn. App. 272, 279–80, 801 A.2d 890, cert. denied, 261 Conn. 939, 808 A.2d 1133 (2002).

The defendant claims that the state failed to disprove beyond a reasonable doubt his justification defense. Essentially, the defendant argues that there was insufficient evidence (1) to disprove that he reasonably believed Judd and Potkaj were using or about to use deadly physical force against him, or were inflicting or about to inflict great bodily harm on him, and that deadly physical force was necessary to repel the attack, (2) to prove that he had a duty to retreat and (3) to prove that he was the initial aggressor. We disagree.

In support of his claim, the defendant posits an alternative factual scenario of the events of July 5, 1998. The defendant had to work the next morning and wanted the partygoers out of the house in the early morning hours. He asked Samantha Witnauer to ask people to leave, but they did not do so. At around 2:30 a.m., the defendant personally began asking people to leave, many of whom did, but several teenagers remained, including Judd, Potkaj, Anderson and Doucette. At about 3 a.m., the defendant entered the kitchen and politely asked the remaining people to leave. Judd then became angry and verbally confronted the defendant in a threatening manner. In response to Judd's actions, the defendant punched him in the face. Potkaj, Anderson and Doucette all then began punching and kicking the defendant, who fought back with punches of his own. During the altercation, the defendant was hit in the head with a

ceramic mug by one of his assailants. At one point, the defendant fell to the floor, where the others kicked him. He managed to free himself and stand up against the kitchen counter. The defendant then grabbed the knife off the counter and made stabbing motions at the group to protect himself, fatally wounding Judd and Potkaj in the process. The defendant suffered several bruises on his body, a laceration over his left eye and a broken left orbital bone as a result of the fight.

Before addressing the defendant's specific arguments, we note that twenty-four witnesses testified at trial. The written and oral statements the defendant made to the police also were admitted into evidence.[5] Those present at 69 House Street testified as to their observations of the stabbings. Those people included Anderson, Doucette, Karen Witnauer, Samantha Witnauer, Lupacchino and McLaughlin. There were many inconsistencies among their versions of the events, some more glaring than others. Clearly, the defendant interprets the evidence as establishing a factual scenario different from the one the jury ultimately found.

"It is the jury's right to accept some, none or all of the evidence presented." (Internal quotation marks omitted.) *State* v. *Smith*, 73 Conn. App. 173, 188, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002). "Moreover, [e]vidence is not insufficient . . . because it is conflicting or inconsistent. [The jury] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [jury] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Colon*, 71 Conn. App. 217,

---

[5] The defendant did not testify at trial.

224–25, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002).

"We do not sit as a [thirteenth] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record." (Internal quotation marks omitted.) *State* v. *Nicholson*, 71 Conn. App. 585, 590, 803 A.2d 391, cert. denied, 261 Conn. 941, 808 A.2d 1134 (2002). Although there was some evidence to support the defendant's version of the events, the jury was free to reject that evidence. Our standard of review dictates that we construe the evidence in the light most favorable to sustaining the verdict. See *State* v. *Johnson*, supra, 71 Conn. App. 279. Applying that standard, we conclude that the verdict should be sustained.

I

The jury was free to disbelieve the defendant's claim of self-defense and to conclude beyond a reasonable doubt that he could not reasonably have believed that he was faced with deadly physical force or great bodily harm at the hands of Judd and Potkaj. The jury also reasonably could have concluded that the defendant's use of deadly physical force was unnecessary. Our Supreme Court has interpreted § 53a-19 (a) to require that "a person may justifiably use *deadly* physical force in self-defense only if he *reasonably* believes *both* that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, *and* (2) that deadly physical force is necessary to repel such an attack." (Emphasis in original.) *State* v. *Prioleau*, 235 Conn. 274, 285–86, 664 A.2d 743 (1995).

The cumulative force of the evidence allowed the jury reasonably to conclude, first, that the defendant did not reasonably believe that deadly physical force was being used or about to be used on him by the victims

because neither of the victims used or threatened the use of weapons during the altercation.[6] In fact, before the defendant grabbed the knife, the fight consisted only of four punches. Judd, who was the only one to hit the defendant, was smaller than the defendant.[7] Also, the injuries ultimately sustained by the defendant reasonably could be found by the jury not to amount to serious physical injury, and, therefore, the means of their infliction did not constitute deadly physical force.

The evidence also is sufficient to prove beyond a reasonable doubt that the defendant did not reasonably believe that great bodily harm was inflicted or about to be inflicted on him. Although the defendant did suffer a broken orbital bone from one of Judd's punches, the jury was free to determine that this injury did not constitute great bodily harm.[8] In addition, there was substantial evidence that the defendant initiated the fistfight and purposefully continued the fight after it had been stopped. That continuation came after the defendant had been punched once in the face by Judd and the defendant then knew the force of Judd's punch. Moreover, until the defendant grabbed the knife, the altercation involved only fists. The defendant's actions under the circumstances would allow a jury reasonably to conclude that the defendant did not believe great bodily

[6] General Statutes § 53a-3 (5) defines "deadly physical force" as "physical force which can be reasonably expected to cause death or serious physical injury . . . ."

General Statutes § 53a-3 (4) defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ."

General Statutes § 53a-3 (3) defines "physical injury" as "impairment of physical condition or pain . . . ."

[7] The defendant was six feet, two and one-half inches tall and weighed 180 pounds whereas Judd was five feet, eleven inches tall and weighed 156 pounds.

[8] The court defined "great bodily harm" as "bodily harm that is substantially more than minor or inconsequential harm."

harm had befallen him or was going to be inflicted on him.

Even if we were to find that the jury determined that the defendant reasonably believed that deadly physical force or great bodily harm was or was going to be used or inflicted on him, we conclude that the jury had sufficient evidence reasonably to find that his use of force was unnecessary under the circumstances. "We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) Id., 286.

The subjective-objective inquiry "requires that the jury make two separate affirmative determinations in order for the defendant's claim of self-defense to succeed. First, the jury must determine whether, on the basis of all of the evidence presented, the defendant in fact had believed that he had needed to use deadly physical force, as opposed to some lesser degree of force, in order to repel the victim's alleged attack. . . .

"If the jury determines that the defendant had not believed that he had needed to employ deadly physical force to repel the victim's attack, the jury's inquiry ends, and the defendant's self-defense claim must fail. If, however, the jury determines that the defendant in fact had believed that the use of deadly force was necessary, the jury must make a further determination as to whether *that belief* was reasonable, from the perspective of a reasonable person in the defendant's circumstances." (Emphasis in original; internal quotation

marks omitted.) *State* v. *Scarpiello*, 40 Conn. App. 189, 206–207, 670 A.2d 856, cert. denied, 236 Conn. 921, 674 A.2d 1327 (1996).

Evidence that the altercation between the defendant and Judd was a mere fistfight that the defendant initiated with no signs of escalation by Judd or Potkaj allowed the jury reasonably to conclude that the defendant did not believe deadly force was necessary to repel Judd's defensive punches. Also, the fact that the defendant purposefully continued the fight without a weapon after it had been broken up demonstrates his belief that resorting to deadly force was unnecessary to combat Judd. Furthermore, evidence that the defendant grabbed the knife and strode six feet toward Judd reasonably can be inferred to prove that the defendant's use of the knife was an offensive rather than defensive attack. The defendant stabbed the victims a total of four times. Two of these wounds required the defendant to use enough force to drive the knife practically to its hilt into each victim. The other two wounds were on the backs of the victims, indicating that they were fleeing from the defendant. There was, therefore, sufficient evidence for the jury reasonably to conclude that the defendant did not reasonably believe deadly force was necessary to repel Judd's defensive punches. Although we address the defendant's remaining claims that there was insufficient evidence to prove that he (1) had a duty to retreat and (2) was the initial aggressor, we note that we are not required to do so because the state proved beyond a reasonable doubt that the defendant was not justified in using deadly physical force under § 53a-19 (a). See *State* v. *Ash*, 33 Conn. App. 782, 789–90, 638 A.2d 633, rev'd on other grounds, 231 Conn. 484, 651 A.2d 247 (1994).

## II

The evidence also supports the conclusion that the defendant was in a position to retreat with complete

safety. Section § 53a-19 (b) provides in relevant part that "a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety . . . by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100 . . . and was not the initial aggressor . . . ." The court, however, did not charge the jury concerning the initial aggressor element of that subsection.[9] The defendant argues that 69 House Street was his dwelling because of the permission Malcomson gave him to watch over and reside at her house while she was on vacation. In the alternative, the defendant argues that if he did have a duty to retreat, he could not have done so in complete safety. We are not persuaded.

The court read to the jury the definition of dwelling provided in General Statutes § 53a-100 (a) (2). That subdivision provides that a dwelling is "a building which is usually occupied by a person lodging therein at night, whether or not a person is actually present . . . ." The court further instructed the jury that the statute "contemplates a duration element, by requiring usual habitation at night. Usual, in this context, means ordinary or customary. Thus, occupation for some period of time is required. In considering whether a house is the defendant's dwelling, the jury can consider evidence such as where the defendant's clothes and personal effects were kept."[10] The court informed the jury that it could consider the note Malcomson had left, giving the defendant permission to reside at the house while she was on vacation as evidence that 69 House Street was his dwelling.

---

[9] The charge referred only to the ability to retreat with complete safety and the defendant having no duty to retreat from his own dwelling.

[10] That instruction is consistent with Connecticut case law. See *State* v. *Bailey*, 209 Conn. 322, 343, 551 A.2d 1206 (1988).

There was sufficient evidence, however, to allow the jury to reasonably conclude that 69 House Street was not the defendant's dwelling. Malcomson rented the house, not the defendant. In addition, Malcomson and Samantha Witnauer were the only two people who lived there. The defendant did not usually reside at the house at night, but lived at 46 Jefferson Lane in East Hartford. His clothing and personal effects were kept in his backpack on July 4 and 5, 1998, which was located in the trunk of Karen Witnauer's car. The jury reasonably could conclude, on the basis of that evidence, that 69 House Street was not the defendant's dwelling and, therefore, that he had a duty to retreat rather than use deadly force.

The court then instructed the jury concerning the duty to retreat.[11] The jury had evidence of photographs and diagrams of the kitchen, as well as the testimony of several witnesses as to the positioning of the participants in the kitchen that night. That evidence permitted the jury reasonably to find that a laundry room with a window to the outside was next to the kitchen counter where the defendant grabbed the knife. The laundry

---

[11] The court stated in its instructions: "[A] person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety by retreating. That means both a retreat was completely safe and available, and the defendant knew it.

"Complete safety means without any injury whatsoever to him. As I have said, self-defense requires you to focus on the person claiming self-defense, on what he reasonably believes under the circumstances, and it presents a question of fact as to whether a retreat with complete safety was available and whether the defendant knew of it.

"The law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive. So, you must ask yourself: Did the defendant know that he could avoid the use of deadly force by retreating with complete safety? Is so, and yet he chose to pursue the use of deadly physical force, you shall reject the self-defense claim."

That instruction is in accordance with Connecticut case law. See *State* v. *Montanez*, 71 Conn. App. 246, 263, 801 A.2d 868, cert. denied, 261 Conn. 935, 806 A.2d 1069 (2002).

room had a door that would close and block the entry of others from the kitchen into that room. The jury heard testimony that no one was blocking the defendant's retreat into the laundry room. Furthermore, the jury reasonably could infer from the evidence that the defendant was familiar with the layout of the house due to his mingling at the house, including the kitchen, over some three hours that night, his presence at the house during the holiday and Malcomson granting him permission to watch over the house from July 2, 1998, until she returned. The jury, therefore, could conclude that retreat into the laundry room was known and available to the defendant.

Additionally, the jury reasonably could find that the defendant knew that avenue of retreat was available and that such retreat could be accomplished with complete safety. Evidence that no one was obstructing the defendant's retreat into the laundry room, that Judd merely was defending himself from the defendant's attacks, and that the defendant strode six feet toward the victims to stab Potkaj and Judd instead of retreating was sufficient to allow the jury reasonably to conclude that the defendant knew no harm would have befallen him in making that retreat.

### III

Finally, the jury also reasonably could have concluded from the evidence presented that the defendant was not justified in using deadly force against the victims because he was the initial aggressor. General Statutes § 53a-19 (c) (a) (2) provides in relevant part that "a person is not justified in using physical force when . . . he is the initial aggressor . . . ." The court defined "initial aggressor" as "the person who acts first in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person. The first person to use

physical force is not necessarily the initial aggressor."[12] The defendant argues that Judd threatened the defendant with physical force when he approached the defendant in the kitchen, thus making Judd the initial aggressor. The jury had sufficient evidence before it, however, that Judd was merely trying to calm the defendant down and did not do so in a threatening manner. There was substantial evidence that the defendant was the first person to punch Judd in the face after yelling and swearing at the teens in the kitchen. That evidence was sufficient to permit the jury reasonably to determine beyond a reasonable doubt that the defendant was the initial aggressor and, therefore, not entitled to claim self-defense.

Our standard of review dictates that we construe the evidence in the light most favorable to sustaining the verdict. See *State* v. *Johnson*, supra, 71 Conn. App. 279. Applying that standard, we determine that the jury reasonably could have concluded that the cumulative force of the evidence disproved the defendant's justification defense of use of force in defense of a person beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] That definition is in compliance with our case law. See *State* v. *Ramos*, 261 Conn. 156, 166–67, 801 A.2d 788 (2002).